590 F.2d 1241
 BOARD OF EDUCATION OF the CITY OF NEW YORK and Irving Anker,
Chancellor of City School District, Plaintiffs,
v.
Ewald NYQUIST, Commissioner of Education of the State of New
York, New York State Division of Human Rights, Defendants,
Claire Cohen, Cynthia Crawford, and Joyce Silversmith, on
behalf of themselves and on behalf of all female Health and
Physical Education Teachers in the New York City School
System, Defendants-Appellees,
Melvin Berman, Noah Gelfond and Daniel Gavrin, on behalf of
themselves and on behalf of all male Health and
Physical Education Teachers in the New
York City School System,
Defendants-Appellants.
 No. 30, Docket 78-6055.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 14, 1978.
Decided Jan. 9, 1979.
 
 Thomas C. Greble, Glen Cove, N. Y. (James R. Sandner, New York City, of counsel), for defendants-appellants.
 Kenneth E. Gordon, New York City (Gordon & Schechtman, Murray A. Gordon, New York City, of counsel), for defendants-appellees.
 Before FEINBERG, MANSFIELD and SMITH, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 This unusual case presents difficult questions regarding the appropriate role of federal courts when called upon by disqualification motions to evaluate the conduct of attorneys who appear before them. Three male Health and Physical Education teachers (HPETs) in the New York City school system appeal from an order of the United States District Court for the Southern District of New York, Morris E. Lasker, J., disqualifying their counsel upon the motion of three female HPETs. Appellant male teachers claim that the order was an abuse of discretion because it disregarded their constitutional rights, and was without any sound basis. For reasons set forth below, we hold that the motion to disqualify should have been denied, and we therefore reverse the order of the district court.
 
 
 2
 * The contending parties on appeal the male and female HPETs are all defendants in this declaratory judgment action brought by the Board of Education of the City of New York and the Chancellor of the City School District. In February 1977, these plaintiffs found themselves in the middle of apparently contradictory positions held by the Commissioner of Education of the State of New York[1] and the office of Civil Rights of the Department of Health, Education and Welfare (HEW). In a case involving one of these appellants, the State Commissioner had ruled that the use of separate seniority lists for male and female HPETs for the purpose of layoffs was illegal.[2] Shortly thereafter, HEW initially indicated to the Board that HEW took exactly the contrary view, that merger of the lists would violate Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq. Caught in this apparent dilemma, plaintiffs provisionally merged the seniority lists of male and female HPETs and commenced this action for a declaratory judgment in which all concerned parties would be present. The complaint named as defendants HEW and its Secretary,[3] the New York State Commissioner of Education, the State Division of Human Rights, three named male HPETs, individually and as representatives of all male HPETs, and three named female HPETs, individually and as representatives of all female HPETs. The male and female defendants have asserted counterclaims and cross-claims. The relief sought by plaintiffs is a judgment declaring that the provisional policy of merging the seniority lists, effective February 1, 1977 but not retroactively, is lawful.
 
 
 3
 The two classes of defendants are the actual contending parties in this litigation. The male HPETs allege that maintaining separate seniority lists for male and female HPETs is illegal and that:
 
 
 4
 all defendant male Health and Physical Education teachers who were laid off on or after September 1, 1975, are entitled to reinstatement with back pay and all other retroactive benefits incident to their positions to the date of their layoff if less senior female teachers were retained at that time or at any time thereafter.
 
 
 5
 The female HPETs allege that their seniority status perpetuates past discriminatory practices of plaintiffs and that if the provisional merged seniority list is used for layoff purposes "it will result in the layoff of at least six times as many female HPETs as male HPETs." The stakes in the lawsuit are obviously high.
 
 
 6
 The male HPETs are represented in this action by James R. Sandner, Esq., who is also General Counsel of New York State United Teachers (NYSUT). That organization is an unincorporated membership association of approximately 180,000 teachers, librarians, guidance counsellors and other school related employees of the almost 800 school districts in New York State.[4] We are told that in each of the school districts there is a separate local union, which is the exclusive bargaining representative for employees in that unit. The majority of these individual unions have chosen to affiliate themselves with NYSUT, but the latter does not collectively bargain for any public employees. It does, however, provide a number of services to its members, including a legal service program under the direction and control of Mr. Sandner. Both the male and female HPETs are represented in collective bargaining by the American Federation of Teachers (AFT), to whom they pay dues. A portion of the dues paid to the AFT is remitted to NYSUT, which, at least in part, apparently finances the legal service program.
 
 
 7
 Under the program, NYSUT's members may apply to obtain legal representation free of charge. Mr. Sandner and his staff may take an applicant's case when, in their judgment, the claim is both job-related and meritorious. It is through this procedure that the male defendants retained Mr. Sandner as their attorney. NYSUT itself, however, has taken no position on the merits or on any other issue in this litigation.
 
 
 8
 The female HPETs moved to disqualify Mr. Sandner as counsel for the male HPETs or, in the alternative, to require NYSUT to furnish counsel for the female teachers. Judge Lasker concluded that "the female teachers are paying, in part, for their opponents' legal expenses." This violated "at least the spirit, if not the letter, of Canon 9 of the Code of Professional Responsibility that 'A lawyer should avoid even the appearance of impropriety.' " Accordingly, the judge granted the motion and this appeal by the male HPETs followed.
 
 II
 
 9
 Appellants' briefs discuss at length various Supreme Court cases dealing with the rights of associational free speech, group-sponsored legal action and First Amendment considerations, e. g., United Transportation Union v. Michigan, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); United Mine Workers v. Illinois State Bar Ass'n, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). These issues are not substantially implicated on this appeal.
 
 
 10
 Button established as part of the First Amendment freedoms of association and political expression the right of a group to litigate controversial points of view in court free of governmental action purporting to regulate the practice of law. Here, however, NYSUT has made no effort to appear in the litigation either as a party or as an amicus. And indeed, appellants repeatedly insist that NYSUT has taken no position on any issue in this litigation. Since there has been no activity by the group, the Button principle is not applicable here.
 
 
 11
 Transportation Union, Mine Workers and Trainmen hold that a state may not, in the guise of regulating the practice of law, consistent with the First Amendment prevent efforts of a union to provide its members practical and economical access to courts to press work-related personal injury claims. Those cases establish the right to engage in "collective activity undertaken to obtain meaningful access to the courts," Transportation Union, supra, 401 U.S. at 585, 91 S.Ct. at 1082, where the members of the group are at least substantially united in interest. None of the claims asserted with the aid of those legal plans would, if successful, have disadvantaged any union member. In contrast, this case presents a seniority dispute where the real adversaries are union members. It is thus difficult to characterize Mr. Sandner's representation of the men as "collective activity" of the group within the meaning of those cases.[5] It is true that also underlying those cases "was the Court's concern that the aggrieved receive information regarding their legal rights and the means of effectuating them." See Bates v. State Bar of Arizona, 433 U.S. 350, 376 n. 32, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). But here there is no claim that the male defendants were unaware of their legal rights.
 
 
 12
 Also not controlling, though not necessarily irrelevant, are the fair representation cases, e. g., Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), discussed by appellants. Those cases hold that, in the context of a union's duty fairly to represent the bargaining unit, a union may, if in good faith, assert a position that benefits some of its members to the detriment of others. Since NYSUT has taken no position on the merits, it is far from clear that the union's right to take a position, established by those cases, is implicated here.
 
 
 13
 Appellants suggest that the recent Supreme Court decision in In re Primus, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978) supports the view that an individual attorney like Mr. Sandner has a First Amendment right to make his views known in the courts even though his conduct in that direction might otherwise breach ethical canons. In Primus, a lawyer, who was also an officer of the Columbia, South Carolina branch of the American Civil Liberties Union (ACLU), orally suggested the possibility of a lawsuit to a woman who had been sterilized as a condition of continued state medical assistance. This was followed by a letter offering the ACLU's free legal assistance. The Supreme Court described appellant's actions as "undertaken to express personal political beliefs and to advance the civil-liberties objectives of the ACLU." 436 U.S. at 422, 98 S.Ct. at 1900. The Court held that attorney Primus's activities so characterized could not be punished as "solicitation" without violating First Amendment freedoms. While the language just quoted refers to the attorney's "personal political beliefs," the main emphasis in the Court's opinion was that the activities under question were "on behalf of the ACLU," Id. at 432, 98 S.Ct. 1893, and were protected under the freedom of association cases already referred to.
 
 
 14
 We doubt that the principle of Primus extends to control this case. The freedom of association cases are distinguishable for the reasons already given. To the extent that Primus protects simply a lawyer's First Amendment rights, the attorney there was encouraging the airing in court of a point of view she believed in, that otherwise probably would not have been asserted by the potential plaintiff with whom she communicated. By contrast, Mr. Sandner's activity here was not really of that informative character. The male HPETs he represents are defendants and would have litigated their point of view (and Mr. Sandner's) regardless of his input. Indeed, it should be noted that the male HPETs sought out Mr. Sandner, not the other way around. Primus does not suggest that an attorney has a First Amendment right to conduct any particular representation, in the face of ethical proscriptions to the contrary, in the absence of any showing that such representation is necessary to facilitate assertion of a specific point of view in court.
 
 
 15
 Thus, while the male defendants have a right to obtain legal advice and representation, we do not believe that on these facts the First Amendment protects the right of a particular attorney to represent them in court. We thus conclude that the First Amendment does not constrain consideration of the propriety of Mr. Sandner's representation and the disqualification order, to which we now turn.
 
 III
 
 16
 We begin the discussion by noting that, curiously, the power of the federal courts to disqualify attorneys in litigation pending before them has long been assumed without discussion, see, e. g., General Contract Purchase Corp. v. Armour, 125 F.2d 147, 149 (5th Cir. 1942); United States v. Bishop, 90 F.2d 65, 66 (6th Cir. 1937); Brown v. Miller, 52 App.D.C. 330, 286 F. 994, 997 (1923); T. C. & Theatre Corp. v. Warner Bros. Pictures, 113 F.Supp. 265, 271 n. 15 (S.D.N.Y.1953), and attention has focused on identifying the circumstances in which exercise of the power is appropriate. Our reading of the cases in this circuit suggests that we have utilized the power of trial judges to disqualify counsel where necessary to preserve the integrity of the adversary process in actions before them. In other words, with rare exceptions disqualification has been ordered only in essentially two kinds of cases: (1) where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code of Professional Responsibility[6] undermines the court's confidence in the vigor of the attorney's representation of his client, see, e. g., Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225 (2d Cir. 1977); Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d 1384 (2d Cir. 1976), or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example, in violation of Canons 4 and 9,[7] thus giving his present client an unfair advantage, see, e. g., Fund of Funds, Ltd. v. Arthur Andersen & Co., supra; Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562 (2d Cir. 1973). In such cases, we note Chief Judge Kaufman's oft-quoted admonition that,
 
 
 17
 When dealing with ethical principles, . . . we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after a painstaking analysis of the facts and precise application of precedent.
 
 
 18
 Fund of Funds, Ltd., supra, 567 F.2d at 227, quoting United States v. Standard Oil Co., 136 F.Supp. 345, 367 (S.D.N.Y.1955). But in other kinds of cases, we have shown considerable reluctance to disqualify attorneys despite misgivings about the attorney's conduct. See, e. g., W. T. Grant Co. v. Haines, 531 F.2d 671 (2d Cir. 1976); Ceramco, Inc. v. Lee Pharmaceuticals, 510 F.2d 268 (2d Cir. 1975). This reluctance probably derives from the fact that disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons. See Allegaert v. Perot, 565 F.2d 246, 251 (2d Cir. 1977); J. P. Foley & Co., Inc. v. Vanderbilt, 523 F.2d 1357, 1360 (2d Cir. 1975) (Gurfein, J., concurring). And even when made in the best of faith, such motions inevitably cause delay. For example, this lawsuit has been at a standstill now for close to a year.
 
 
 19
 Weighing the needs of efficient judicial administration against the potential advantage of immediate preventive measures, we believe that unless an attorney's conduct tends to "taint the underlying trial," see W. T. Grant Co., supra, 531 F.2d at 678, by disturbing the balance of the presentations in one of the two ways indicated above, courts should be quite hesitant to disqualify an attorney. Given the availability of both federal and state comprehensive disciplinary machinery, see, e. g., Local Rules of the United States Court of Appeals for the Second Circuit § 46(h) (1978), there is usually no need to deal with all other kinds of ethical violations in the very litigation in which they surface. See Lefrak v. Arabian Am. Oil Co., 527 F.2d 1136, 1141 (2d Cir. 1975); Ceramco, Inc. v. Lee Pharmaceuticals, supra, 510 F.2d at 271. Cf. United States v. Pastore, 537 F.2d 675 (2d Cir. 1976).
 
 
 20
 With these thoughts in mind, we turn to the ethical problems presented by the instant appeal.[8] The district court disqualified Mr. Sandner because a "layman's faith would be severely troubled" by the fact that "the female teachers are paying, in part, for their opponents' legal expenses." There is no claim, however, that Mr. Sandner feels any sense of loyalty to the women that would undermine his representation of the men. Nor is there evidence that his representation of the men is anything less than vigorous. There is also no claim that the men have gained an unfair advantage through any access to privileged information about the women. Were there any such problem, the women would not be asking, and the district judge would not have ordered, as an alternative to disqualification of Mr. Sandner, that NYSUT pay their attorney's fees. Thus, in no real sense can Mr. Sandner's representation of the men be said to taint the trial.
 
 
 21
 We agree that there is at least some possibility that Mr. Sandner's representation of the men has the appearance of impropriety, because of the large number of union members involved and the public importance of the civil rights issue at the heart of the dispute. But in any event, we think that disqualification was inappropriate. We believe that when there is no claim that the trial will be tainted, appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases. This is particularly true where, as in this case, the appearance of impropriety is not very clear. We note that while on one hand there is an element of unfairness to the women,[9] on the other it seems probable that if NYSUT were to take a position on the merits of this litigation, Mr. Sandner's representation of the men would apparently be within the protection of the "fair representation" cases discussed in Part II, Supra. This means that the question whether Mr. Sandner's conduct is unethical could be a very close one. Since disqualification entails immediate disruption of the litigation, it is better to relegate any questions about Mr. Sandner's conduct to other appropriate proceedings. In addition to the possibility of grievance proceedings and an internal union attack on the legal plan, see note 9, Supra, it may be that judicial construction of the plan, in an appropriate lawsuit, could provide some relief for the women.
 
 
 22
 We therefore reverse the order of the district court disqualifying counsel, and remand for continuation of the action.
 
 MANSFIELD, Circuit Judge (concurring):
 
 23
 For the reasons ably stated by Judge Feinberg, I concur in the view that a federal court should not disqualify an attorney on ethical grounds from representing a party in a pending lawsuit in the absence of a reasonable basis for believing that his or her unprofessional conduct may affect the outcome. An "appearance of impropriety" on an attorney's part would rarely have this effect.[1] The attorney is the client's choice. Disqualification is wasteful and time-consuming. Only where the attorney's unprofessional conduct may affect the outcome of the case is there any necessity to nip it in the bud. Otherwise conventional disciplinary machinery should be used and, if this is inadequate, the organized bar must assume the burden of making it effective as a deterrent.
 
 
 24
 Regardless of the foregoing principle, however, in the present case I would reverse the district court's decision on the ground that there is no "appearance of impropriety" in the representation by an association-salaried lawyer such as Mr. Sandner of one set of dues-paying members pursuant to its legal services program in a case involving other dues-paying members with conflicting interests. Obviously if NYSUT, either through its charter, by-laws or some other authoritative official action, had prohibited its counsel from representing members in such a situation or had specified the terms and conditions under which legal services could be provided to members, those provisions would govern and the association's counsel would be obligated to conduct himself accordingly. But absent such a bar or blueprint, an organization financed with dues received from all members may properly take a position that benefits some members at the expense of others, provided it acts reasonably, in good faith and without hostility or arbitrary discrimination. Humphrey v. Moore, 375 U.S. 335, 349-50, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). If it is proper for the organization to do so, there is no impropriety in its counsel doing likewise, subject to the same conditions.
 
 
 25
 The relevant legal principle has been clearly stated by the Supreme Court with respect to the analogous question of fair union representation in Humphrey, supra:
 
 
 26
 "But we are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another. In Ford Motor Co. v. Huffman, 345 U.S. 330 (73 S.Ct. 681, 97 S.Ct. 1048), the Court found no breach of duty by the union in agreeing to an amendment of an existing collective bargaining contract, granting enhanced seniority to a particular group of employees and resulting in layoffs which otherwise would not have occurred. 'Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.' Id., at 338 (73 S.Ct. 681). Just as a union must be free to sift out wholly frivolous grievances which would only clog the grievance process, so it must be free to take a position on the not so frivolous disputes. Nor should it be neutralized when the issue is chiefly between two sets of employees. Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes.
 
 
 27
 "As far as this record shows, the union took its position honestly, in good faith and without hostility or arbitrary discrimination. . . . By choosing to integrate seniority lists based upon length of service at either company, the union acted upon wholly relevant considerations, not upon capricious or arbitrary factors. The evidence shows no breach by the union of its duty of fair representation."
 
 
 28
 In my view the same principles govern NYSUT's administration of its legal services plan.
 
 
 29
 Although NYSUT has not taken any official position with respect to the issues at stake in this case, its members have adopted a legal services plan authorizing its salaried counsel to represent such members as he determines in good faith to have claims or defenses that are job-related and meritorious. Nothing in the plan requires prior approval by NYSUT of such representation or limits the representation to legal controversies with third parties, as distinguished from representation of NYSUT or some of its members in differences with other members. The sole standard is whether in the opinion of NYSUT's counsel the claim or defense is job-related and meritorious, regardless of the identity or membership of other parties involved in the legal controversy.
 
 
 30
 This standard strikes me as fair and reasonable. I fail to detect in it any appearance of impropriety, as long as NYSUT's counsel, in the course of representing the male HPETs, does not express or imply without authority that he speaks for NYSUT. Membership in NYSUT is entirely voluntary. A dues-paying member should recognize that situations will arise where the successful representation of one member or a group of members may benefit them at the expense of other members. Common examples are disputes over seniority rules, claims of unfair layoffs, transfers and denials of promotion. A person joining the organization and paying dues should therefore anticipate that if he or she becomes embroiled in a job-related controversy with NYSUT or another member, (1) NYSUT's counsel must make a choice and render services only to those members believed in good faith by him or her to have meritorious job-related claims or defenses, (2) NYSUT will not provide counsel to members whose claims or defenses are believed by its counsel in good faith to be frivolous or not job-related, and (3) in a dispute between members of the organization its counsel, in representing those believed to have a meritorious cause, will be financed by NYSUT through funds derived in part from dues-paying members who are adverse parties in the litigation.
 
 
 31
 NYSUT's provision of legal services to one member or group of members believed in good faith to have meritorious job-related claims against other members should not be labelled as creating an "appearance of impropriety" simply because the other members may take adverse positions believed by NYSUT's counsel to be frivolous or meritless. Nor should the organization, absent a contrary provision in its plan, be forced to represent members believed by it to be asserting such frivolous claims or defenses. Cf. Vaca v. Sipes, 386 U.S. 171, 191, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Humphrey v. Moore, 375 U.S. 335, 349-50, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). None of this is intended to imply that we, as distinguished from NYSUT or its counsel, have any views regarding the merits of the claims of the male and female HPETs respectively.
 
 
 32
 It could be argued that the NYSUT legal services plan vests its counsel with too wide a discretion to determine what members' claims are meritorious or job-related in an intra-organizational dispute, or that the plan poses too great a risk of erroneous, invidious, fraudulent or discriminatory decisions by its counsel in such matters. If so, the remedy rests in the hands of NYSUT's members who have the power to change or modify its legal services plan. In addition, of course, they would be entitled to seek relief from the court upon a showing that NYSUT's counsel had abused his powers or acted in bad faith or for reasons unconnected with the merits of the cause which he chose to advance.
 
 
 33
 In the recent decision of Jacobs v. Board of Educ., East Meadow Union Free School District, App.Div., 409 N.Y.S.2d 234 (2d Dept. 1978), which was handed down since the argument of this appeal, the Appellate Division, Second Department, of the New York Supreme Court reversed a lower court decision that had been relied upon by appellees and decided that there was no impropriety in representation by NYSUT's counsel of one of its members in a so-called "one-on-one" dispute with another member with respect to seniority, even though the organization had not taken any more of an "official" position with respect to the merits of the dispute than has NYSUT in the present case. Assuming it is proper for an organization's counsel to represent one member against another in a "one-on-one" seniority dispute, despite the absence of any organizational position with respect to the issue in dispute, I find no rational basis for distinguishing Jacobs from the present case.
 
 
 34
 Applying these relevant legal principles here, it was not improper for NYSUT's counsel to provide legal representation to the male HPETs whose job-related claim was reasonably believed by him to be meritorious. I would therefore hold not only that an "appearance of impropriety" is an insufficient ground, by itself, to justify a court's disqualification of an attorney during the prosecution of a case absent a reasonable basis for believing that such an appearance may affect the outcome, but also that in any event there was no such "appearance of impropriety" on the facts of this case.
 
 
 
 [1]
 At that time, the Commissioner was Ewald Nyquist
 
 
 [2]
 In the Matter of the Appeal of Daniel Gavrin, No. 9321 (Oct. 5, 1976)
 
 
 [3]
 These defendants have since been dismissed from the case by Judge Lasker
 
 
 [4]
 Some NYSUT members are employees of private schools and universities
 
 
 [5]
 Nor is there here the need to provide representation to the men in order to redress an imbalance in legal resources. In the Supreme Court's group legal plan cases, there was evidence that the plans' purpose was to combat the overreaching by both employers and members of the bar that had in the past effectively thwarted recovery of adequate compensation for injuries. Since the contending parties here are all union members, the men's resources are presumably comparable to their adversaries'
 
 
 [6]
 Canon 5 provides:
 A lawyer should exercise independent judgment on behalf of a client.
 Canon 9 provides:
 A lawyer should avoid even the appearance of professional impropriety.
 
 
 [7]
 Canon 4 provides:
 A lawyer should preserve the confidences and secrets of a client.
 
 
 [8]
 There is no dispute that the order here is appealable, but we do take note of recent controversy centering on appealability of district court orders Denying a disqualification motion. See Note, The Appealability of Orders Denying Motions for Disqualification of Counsel in the Federal Courts, 45 Chi.L.Rev. 450 (1978). Although Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 496 F.2d 800 (2d Cir. 1974) (en banc) recently established that such orders denying disqualification are appealable in this circuit, there have been later rumbles of discontent regarding the new rule. See Allegaert v. Perot, 565 F.2d 246, 251 (2d Cir. 1977); W. T. Grant Co. v. Haines, supra, 531 F.2d at 677-78; Van Graafeiland, Lawyer's Conflict of Interest A Judge's View (Part II), N.Y.L.J., July 20, 1977, at 1, col. 2. Obviously where, as here, the motion seeking disqualification has been Granted, appellate review is appropriate
 
 
 [9]
 The unfairness may in part be due to the nature of the plan adopted by NYSUT which leaves so much to Mr. Sandner's discretion. This suggests that the women should take whatever steps are possible within normal internal union processes. Cf. also Abood v. Detroit Board of Education, 431 U.S. 209, 237-42, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977)
 
 
 [1]
 Our decision in General Motors Corporation v. City of New York, 501 F.2d 639 (2d Cir. 1974), is an example of a case where a combination of an attorney's "appearance of impropriety" plus his violation of another disciplinary rule might have affected the outcome. There we held that a lawyer who had, as an attorney for the Antitrust Division of the Department of Justice, been involved with a Government investigation of and lawsuit against General Motors alleging monopolization of the market for city buses, was barred from later representation in private practice of the City of New York in its antitrust suit for damages against General Motors based on essentially the same claims, albeit with respect to a later point in time. Although we there noted the importance of a lawyer's avoiding an appearance of impropriety as required by Canon 9, we also emphasized the additional specific prohibition of D.R. 9-101(B), not applicable here, to the effect that "A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee," 501 F.2d at 648-49. Implicit in this Disciplinary Rule is the concern that the former Government attorney might in the later private action use information with respect to the matter in issue which was gained in confidence as a public employee and was unavailable to the other side