**GAF CORPORATION, Plaintiff,**

v.

**Sam HEYMAN, Defendant.**

**Samuel J. HEYMAN, Plaintiff,**

v.

**GAF CORPORATION, Jesse Werner, T. Roland Berner, Peter Bosshard, Augustine Markusi, Julliette M. Moran, James T. Sherwin, Richard F. Smith, Herman Sokol, Nolan B. Sommer and Robert Spitzer, Defendants.**

Nos. 82 Civ. 6319 (LFM), 82 Civ. 7442 (LFM).

United States District Court, S.D. New York.

March 15, 1983.

Hughes, Hubbard & Reed by Jerome G. Shapiro, George A. Davidson and Theodore V.H. Mayer, New York City, for GAF Corp.

Finley, Kumble, Wagner, Heine, Underberg & Casey by Alan M. Gelb, P.C. and Ronald D. Hariri, New York City, for Samuel Heyman.

## OPINION

MacMAHON, Senior District Judge.

GAF Corporation (GAF) has moved, pursuant to Canons 4, 5 and 9 of the Code of Professional Responsibility, for an order disqualifying the firm of Finley, Kumble, Wagner, Heine, Underberg & Casey (Finley Kumble) as counsel for Samuel Heyman in these actions. The basis for these motions is that an associate of Finley Kumble,. Robert B. Smith, has recently represented GAF on substantially related matters as an associate of the firm of Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney (Hannoch Weisman). On March 9, 1983, the motions for disqualification were denied. This opinion follows.

## FACTS

In early 1982, Heyman, a substantial minority stockholder of GAF, prepared to initiate a proxy contest to unseat the corporation's board of directors at the annual meeting. As part of this effort, Heyman hired professional advisers and assembled a slate of nominees for election as GAF directors. However, Heyman abandoned his plan, and on March 21, 1982 entered into an agreement with GAF (the Agreement) in order to avoid a proxy contest. In the Agree-

ment, Heyman represented that he had expended in excess of $250,000 in connection with the contemplated proxy fight. GAF agreed to pay Heyman $250,000 toward these expenses, and Heyman promised to reimburse GAF should his final expenses amount to less than that sum. Pursuant to the Agreement, GAF issued the following press release on March 22, 1982:

> GAF Corporation has announced that it has received inquiries from a major corporation asking whether GAF would be willing to consider being merged into that company, and from two other corporations asking whether GAF would be willing to consider selling its building materials business. GAF has replied in the affirmative to these inquiries and has retained Morgan Stanley & Co. to assist GAF in pursuing opportunities arising from such inquiries with a view towards maximizing near term benefits to its shareholders. Morgan Stanley will also assist GAF in structuring a possible leveraged buyout in the event the building materials business is sold.

In the Agreement, GAF represented that it would pursue the opportunities described above, and in the event that it was unsuccessful, would enlist the aid of Morgan Stanley or other investment bankers in seeking similar opportunities.

In *GAF Corp. v. Heyman,* 82 Civ. 6319, GAF sued Heyman for breach of the Agreement and fraud in its inducement, seeking an accounting, rescission and punitive damages. In its complaint, GAF alleges that Heyman made false representations with respect to his expenses and refused to account for them as required by the Agreement. In his answer, Heyman pleaded fraudulent representations as an affirmative defense, representations which were allegedly designed to induce Heyman to drop his proxy fight. Essentially, Heyman asserts that the statements in the press release set out above were false.

In *Heyman v. GAF,* 82 Civ. 7442, Heyman alleges that the directors of GAF have mismanaged the corporation for the purpose of perpetuating the control of Dr. Jesse Werner, Chairman of the Board and Chief Executive, and otherwise benefitting themselves. In particular, Heyman claims that the directors have approved compensation for Werner which is excessive, wasteful and unreasonable. Moreover, Heyman contends that the March 22 press release was but one of a series of three statements (the others dated late June and September 30, 1982) designed to procure proxies and forestall a proxy fight in an effort to maintain control of GAF. It is Heyman's contention that there were never serious, good faith negotiations to effect a merger of GAF or a sale of its building materials business, and that representations that there were such negotiations were made "recklessly and with negligent disregard of the truth." Heyman asserts five claims in total, in an individual and derivative capacity, based upon alleged violations of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (1976), the rules and regulations thereunder, and Delaware law.

These cases are in their pretrial stage at a time when Heyman is preparing to mount a proxy contest in connection with GAF's 1983 annual meeting. In disposing of these motions, we have heard argument by counsel and have examined the motion papers, which include numerous affidavits submitted by the parties.

## SMITH'S PRIOR REPRESENTATION OF GAF

Robert Smith was employed as a litigation associate by Hannoch Weisman from January 2, 1980 to February 26, 1982. Hannoch Weisman has represented GAF in a wide variety of matters and plays a particularly important role in coordinating product liability litigation relating to GAF's building materials business. In 1981, GAF's building materials business accounted for $372 million out of total corporate sales of $673 million. "Built-up" roofing, which is commercial roofing constructed on site, accounts for 20% of the sales of the building materials business; prepared roofing, consisting of residential shingles, comprises the remainder.

There has been a flood of litigation relating to the building materials business, especially built-up roofing. These suits typically allege breach of warranty, negligence and strict liability in tort, and seek damages in the range of $100,000 to $500,000. On occasion, particularly in cases involving "coated felt" roofing, plaintiffs seek punitive damages on the ground that GAF intentionally marketed defective products in an effort to augment short term profits. In three recent coated felt actions, juries have awarded punitive damages against GAF totalling $4.5 million.

In addition, GAF has become embroiled in litigation as a result of its sales of asbestos products. There are 8,700 such suits pending against GAF nationwide. A particularly important case is a declaratory judgment action by GAF against the Insurance Company of North America (INA) and other insurers, in which the terms and existence of GAF's insurance coverage for the asbestos cases is at issue. Hannoch Weisman played an important role in preparing this case, which is now pending in California.

While associated with Hannoch Weisman, Smith spent 950 hours on GAF cases, 685 of which were devoted to built-up roofing litigation. He worked principally on roofing felt cases involving claims of negligence, breach of warranty, and strict liability. The tasks Smith performed included legal and factual research, drafting of motions and briefs, conducting depositions, and making court appearances in connection with his cases. Smith worked largely under the supervision of Joseph Fleischman, who is the Hannoch Weisman partner in charge of built-up roofing litigation. On this much, but little else, the parties are in agreement.

It is GAF's contention that Smith bore major responsibility as the "lead associate" on built-up roofing litigation. He formulated litigation strategy, worked closely with in-house counsel, interviewed key corporate executives, and reviewed extensive files, or so it is claimed. In this role, Smith is alleged to have been exposed to confidential information regarding the products comprising the building materials business; their history and financial, technical and marketing data relating to them; GAF's litigation strategy and potential liability in these cases; and the decision-making process and philosophy of GAF's senior management with respect to the building materials business. In addition, Smith is claimed to be privy to

> facts and circumstances bearing on issues of integrity, effectiveness, and business judgment of GAF management (and) facts and circumstances ... likely to be relevant to the salability, and to management information and attitudes with respect to salability, of the building materials business.

Smith sharply disputes these assertions, stating that his role was that of a junior associate who performed routine litigation tasks, mainly legal research. In short, he claims ignorance of confidential information in each of the areas mentioned above.

In resolving this dispute for purposes of attorney disqualification, we note that a lawyer is conclusively presumed to have received relevant client confidences as to matters involved in his prior representation, that is, it is not GAF's burden to demonstrate that Smith actually received confidential information or even had access to it. *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 571 (2d Cir.1973); *T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265, 268 (S.D.N.Y.1953). Rather, GAF need only show that Smith's prior representation was such that he was *likely* to be privy to relevant confidential information. *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739 (2d Cir. 1978). However, when a lawyer plays a peripheral role in a matter, spending a short time on tasks such as legal research, he may later rebut the presumption that he received client confidences. *Silver Chrysler Plymouth v. Chrysler Motors Corp.,* 518 F.2d 751, 756–57 (2d Cir.1975). Of course, this presumption is also rebuttable when it arises from a lawyer's mere association with a firm. *Id.* at 757.

On the basis of the affidavits submitted by both parties, we find little reason to believe that Smith was privy to confidential information regarding either the financial significance of the asbestos cases or the issues of management integrity and business judgment raised by the punitive damage claims. It is undisputed that Smith handled no cases involving punitive damages. His only participation in asbestos matters was truly peripheral—he filed a deposition notice in the INA case. Smith denies knowing client confidences in either area, and the affidavits submitted by GAF are quite hazy on this point.

We will assume, however, that Smith possesses client confidences touching upon other areas mentioned above. His participation in building materials suits was quite substantial, involving hundreds of hours. Moreover, matters such as the product history of the building materials business, the litigation strategy and potential liability of GAF, and management's decision-making process regarding the building materials business, for example, do appear to be somewhat relevant to cases on which Smith worked. In any event, we will not put GAF to the task of revealing the confidences in order to prove that Smith was aware of them. *See, Government of India v. Cook Industries, Inc., supra,* 569 F.2d at 740 and cases cited therein.

## DISCUSSION

■ Canon 4 imposes upon the attorney the duty to preserve the confidences and secrets of his client. A lawyer may be disqualified pursuant to Canon 4 if he has accepted employment adverse to the interests of a former client on a matter substantially related to his prior representation. In moving to disqualify Finley Kumble pursuant to Canons 4 and 5 (the latter of which requires a firm to withdraw from a case when an attorney associated with that firm is disqualified), GAF must demonstrate that Smith should be disqualified. In doing so, GAF bears the burden of showing (1) that the issues in the cases in which Smith previously participated are substantially related

to the issues in the present cases, and (2) that Smith's involvement in the prior cases was such that he was likely to come across relevant privileged information. *Government of India v. Cook Industries, Inc., supra,* 569 F.2d at 739. Whether Smith was privy to client confidences has been considered above. It is the presence or absence of a substantial relationship that concerns us here.

■ At first glance, there is little, if any, relationship between product liability suits involving GAF building materials and cases claiming that GAF's senior management misrepresented its intentions to sell the building materials business. However, GAF argues that in certain crucial respects the prior and present cases share common issues of fact. As a result of defending the product liability actions, Smith is alleged to be privy to confidential information concerning "the management, profitability, salability, and value of the building material business." (Brief at 16.) This information, GAF claims, bears importantly on senior management's plans regarding the building materials business and thus ultimately relates to whether management's representations regarding the business were false. In this sense, GAF claims that the product liability cases and the present suits are substantially related. We disagree.

While there may be some relationship between the issue in Smith's prior and present representations, this relationship is too attenuated to characterize as substantial. As the Second Circuit noted in *Government of India v. Cook Industries, Inc., supra,* the substantial relationship test has recently resulted in attorney disqualification,

> only upon a showing that the relationship between the issues in the prior and present cases is *"patently clear"*. *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., supra,* 518 F.2d at 754–56. Put more specifically, disqualification has been granted or approved recently *only when the issues involved have been "identical" or "essentially the same."*

569 F.2d at 739–40 (emphasis added). *See also, Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., supra,* 518 F.2d at 754–56 and cases cited therein. This "high standard of proof" is founded upon the client's right to choose his own counsel, which is balanced against the need to maintain the highest standards of the profession and to guard a former client's confidences.

There is no question that information pertaining to the management, profitability, potential exposure and value of a business impacts upon a decision of whether or not to sell the business. However, whether the building materials business is salable, or even whether senior management of GAF believed it to be salable, is not directly in issue in either of the cases before us. Rather, what is at issue is whether the senior management of GAF, as part of a campaign to fend off a proxy fight, issued false statements claiming that serious negotiations regarding the potential sale of the business were underway and would continue during 1982. Also at issue is whether senior management utilized corporate resources in this campaign in breach of fiduciary duty. The issues in the prior product liability and present cases cannot be termed identical or essentially the same.

There is no claim by GAF that Smith worked on matters reflecting senior management's intent to sell the building materials business during 1982. Indeed, it is undisputed that he did no corporate work for GAF and was not in a position to determine whether the negotiations in question were conducted in good faith or were a sham. *Cf. NCK Organization LTD v. Bregman,* 542 F.2d 128, 131 (2d Cir.1976) (where attorney was privy to "corporate state of mind" regarding transactions at issue, disqualification is warranted). It is equally undisputed that Smith had no direct contact with the directors of GAF during his tenure at Hannoch Weisman. Therefore, the likelihood that he was aware of information bearing upon senior management's intent in 1982 is minimal, particularly since Smith had left the firm before most of the events giving rise to this litigation took place. *Cf.*

*Richardson v. Hamilton International Corp.,* 469 F.2d 1382, 1384 (3d Cir.1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973) (where attorney reviewed the personal files of officers and directors and interviewed these individuals, disqualification from a substantially related matter is justified).

GAF also claims that Smith was exposed to information reflecting the integrity and business judgment of senior management. However, those issues were implicated mainly in cases claiming punitive damages in which Smith did not participate. In any event, the product liability actions raised questions of integrity and business judgment with respect to the marketing of GAF products. The present cases raise those issues in the context of a struggle for control of GAF in which it is alleged that misleading statements were made and corporate funds were improperly spent. Thus, the issues of management integrity and business judgment as raised in the prior and present cases are, in our view, quite different.

In summary, we find that it is unlikely that Smith, as a result of his prior representation of GAF, possesses confidential information that can be used against GAF in the present cases. Accordingly, we decline to disqualify Finley Kumble pursuant to Canons 4 and 5 of the Code of Professional Responsibility.

## CANON 9

GAF also moves to disqualify Finley Kumble pursuant to Canon 9, which counsels lawyers to avoid even the appearance of impropriety. We agree that the facts of these cases may arouse suspicion in the mind of an average layman. Smith left Hannoch Weisman in February 1982 and commenced work at Finley Kumble almost immediately thereafter. It was during this time that some of the events giving rise to these cases took place. Moreover, although Finley Kumble is a firm of over 250 lawyers, it has unfortunately assigned Smith to work on at least some aspects of these cases. A cynical observer would believe,

perhaps, that this has been done deliberately, with a view toward utilizing confidential information obtained by Smith during his prior employment. However, applicable precedent convinces us that the appearance of impropriety, standing alone, does not warrant attorney disqualification in this circuit. Rather, disqualification hinges upon whether the adversary process will be tainted by a breach of ethics. *Board of Education v. Nyquist,* 590 F.2d 1241, 1246–47 (2d Cir.1979). As the court in *Nyquist* noted, the integrity of the adversary process is threatened in essentially two kinds of cases: (1) where an attorney's conflict of interest undermines the court's confidence in the vigor of the attorney's representation of his client; and (2) where the attorney is in a position to use privileged information concerning the other side obtained through prior representation, giving his present client an unfair advantage. *Id.* at 1246.

Here, the vigor of Finley Kumble's representation of Heyman is unquestioned. Because we find that Smith is likely to be aware of no confidential information that can be used against GAF in these cases, we decline to disqualify Finley Kumble pursuant to Canon 9. As the court noted in *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., supra,* 518 F.2d at 757, "[a]lthough Canon 9 dictates that doubts should be resolved in favor of disqualification ... it is not intended to completely override the delicate balance created by Canon 4 and the decisions thereunder. *See also, International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1295 (2d Cir.1975) ("We caution that Canon 9, though there are occasions when it should be applied, should not be used promiscuously as a convenient tool for disqualification when the facts simply do not fit the rubric of other specific ethical and disciplinary rules.").

Accordingly, the motions for disqualification having been denied, the parties are ordered to proceed expeditiously with discovery.

So ordered.