David W. EVANS, Plaintiff-Appellant,

v.

ARTEK SYSTEMS CORPORATION, Dynatech Corporation, J.P. Barger, William W. Welsh, Jr., Charles G. Leonhardt, Webster B. Brockelman, Jr., David K. Felbeck, John N. Fricker, Clarence A. Kemper and Michael K. Bender, Defendants-Appellees.

No. 1297, Docket 82–7969.

United States Court of Appeals, Second Circuit.

Argued May 18, 1983.

Decided Aug. 25, 1983.

I. Stephen Rabin, New York City (Allan R. Peckel, Kenneth A. Elan, Rabin & Silverman, New York City, of counsel), for plaintiff-appellant.

Stephen A. Weiner, New York City (Winthrop, Stimson, Putnam & Roberts, New York City, of counsel), for defendants-appellees Artek Systems Corp., Dynatech Corp., J.P. Barger, William W. Welsh, Jr., Webster B. Brockelman, Jr., David K. Felbeck, John N. Fricker, Clarence A. Kemper and Michael K. Bender.

Before MANSFIELD, MESKILL and KEARSE, Circuit Judges.

MANSFIELD, Circuit Judge:

David Evans appeals from an order of the Eastern District of New York, Mark A. Costantino, *Judge,* disqualifying the law firm of Rabin & Silverman from representing him in this action. We remand the case for further factual findings.

Evans was a shareholder of Artek Systems Corporation ("Artek"), a manufacturer of scientific measurement devices, prior to Artek's later merger into a wholly-owned subsidiary of Dynatech Corporation, another manufacturer of scientific instruments. For several years, ending in 1976, the firm of Rabin & Silverman ("R & S") served as general counsel to Artek. That relationship was terminated on March 31, 1976, and R & S resigned as Artek's counsel.

In November 1977 Dynatech acquired 60% of Artek's common stock. In July 1980, the then-President of Artek, Charles G. Leonhardt, consulted briefly with R & S about possible legal action that might be taken against Dynatech based on alleged wrongful conduct causing injury to Artek

and its minority public stockholders. Leonhardt furnished to R & S a confidential memorandum setting forth "from a layman's point of view" facts relied on by him in formulating an "overall plan of action." The memorandum advised that Dynatech had deliberately engaged in a course of conduct, details of which were furnished, that was intended to and had the effect of driving down the market price of Artek stock so that Dynatech could purchase the stock of the minority shareholders and effectuate a merger at a bargain rate on the basis of the depressed value of Artek stock. The July 1980 memorandum went on to state that Dynatech had also damaged Artek and its minority stockholders in violation of anti-trust laws by using its 60% control of Artek and its leverage as a customer of Artek to interfere with Artek's profitable relationship with its distributor, Fisher Scientific Co., and to prevent Artek from selling certain equipment in competition with Dynatech.

In support of his claim that Dynatech was unlawfully interfering with Artek's arrangement with Fisher for distribution of Artek products Leonhardt also furnished to R & S a copy of a June 27, 1979 opinion letter that had been rendered by the law firm of Crowell & Moring to Dynatech with reference to the question of whether action taken by Dynatech to restrict or terminate Fisher's marketing efforts on behalf of Artek would violate the anti-trust laws. A copy of the opinion letter had been sent to Leonhardt under cover of a July 6, 1979, memorandum by W.W. Welsh, Group Vice President of Dynatech and Chairman of Artek, advising Leonhardt "They have taken care to stamp this as a privileged and confidential attorney-client communication. (Charlie, you are an officer of Dynatech Laboratories, so I'm hoping you fall under the category of client) I am sure it would be best that we show this letter to others only after advice from Ed."

Thus the record to date indicates that although Leonhardt was the President of Artek and may have held some office in Dynatech he was seeking legal advice from R & S, apparently without the knowledge of Dynatech's management or Artek's Chairman, in order to protect Artek's minority public stockholders against wrongdoing on the part of Dynatech. There is no evidence that any other Dynatech or Artek officers or personnel were aware of Leonhardt's consultation of R & S, or that Leonhardt was consulting R & S for the purpose of protecting Dynatech by anticipating or preparing to counter action that might be taken by Artek's minority stockholders. R & S received no fee for its consultation with Leonhardt.

Later developments also indicate that Leonhardt may have consulted R & S not on behalf of Dynatech or Artek but in his individual capacity, seeking to protect the interests of Artek's minority public stockholders in opposition to the Dynatech group which then controlled a majority of Artek's stock. In particular, although Leonhardt is nominally a defendant in the present suit, his answer to Evans' complaint admits nearly all of the allegations of wrongdoing by Dynatech. In addition, unlike the remaining defendants, Leonhardt does not appear to object to the representation by R & S of the plaintiff here.

In August 1982 Dynatech merged with Artek, and Artek became a wholly-owned subsidiary of Dynatech. The shareholders of Artek were given one share of Dynatech stock for each eight shares of Artek stock, or about $1.75 in market value of Dynatech stock for each share of Artek stock. According to Leonhardt's July 1980 memorandum to R & S, the stock had sold as high as $7 per share before Dynatech took steps to depress its value.

On August 4, 1982, Evans, represented by R & S, filed suit on behalf of a class of minority shareholders of Artek against Dynatech, Artek, and the individual directors of Artek. Count I of the complaint alleged that Dynatech had violated § 10(b) of the Securities Exchange Act and Rule 10b–5, 17 C.F.R. § 240.10b–5, by taking various actions, including the cancellation of the Fisher contract, to cause the value of Artek stock to decline. Count II alleged that Ar-

tek had sent a false and misleading proxy statement to shareholders in violation of §§ 10(b) and 14(a) of the Securities Exchange Act. Finally, Count III, brought as a derivative action on behalf of Artek, alleged that Dynatech committed waste upon Artek's corporate assets in order to benefit Dynatech. Although Artek is named as a defendant, plaintiff apparently intended it to be a nominal party since the thrust of the complaint is that Artek was deliberately harmed by Dynatech, its controlling competitor, which took various unlawful steps to lower the market value of Artek shares and thus injure its minority public stockholders to the ultimate profit of Dynatech as majority 60% stockholder. Moreover, Count III seeks damages derivatively *on behalf of Artek.*

The defendants, except for Leonhardt, moved to disqualify R & S as counsel to the plaintiff, primarily on the ground of the July 1980 consultation by Leonhardt with R & S, and secondarily on the basis of R & S's service as general counsel to Artek until March 1976. However, there is no indication that as general counsel prior to 1976 R & S could have become involved in subject matter related in any way to this lawsuit, which deals with conduct that did not occur until 1979. The district court granted the motion in open court without stating the facts upon which it based its decision other than to refer generally to R & S's representation of Artek in 1976.

## DISCUSSION

■ Ordinarily an attorney may not knowingly reveal a confidence of his client or use a confidence of his client to the disadvantage of the client.[1] See *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 227 n. 2 (2d Cir.1977); ABA Com. on Ethics and Professional Responsibility,

Code of Professional Responsibility, Canon 4–101(B). To ensure faithful adherence to this principle, an attorney may be disqualified from representing a client in a particular case if

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Cheng v. GAF Corp.,* 631 F.2d 1052, 1055–56 (2d Cir.1980), *judgment vacated on other grounds,* 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981); *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 570–71 (2d Cir.1973); *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265, 268 (S.D.N.Y.1953).

The objective of the disqualification rule is to "preserve the integrity of the adversary process," *Board of Education of the City of New York v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979). However, while we have not hesitated to disqualify counsel when the circumstances warranted it, we have also noted that "there is a particularly trenchant reason for requiring a high standard of proof on the part of one who seeks to disqualify his former counsel, for in disqualification matters we must be solicitous of a client's right freely to choose his counsel—a right which of course must be balanced against the need to maintain the highest standards of the profession." *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739 (2d Cir.1978). We have also noted that disqualification mo-

---

1. Canon 4 provides: "A lawyer should preserve the confidences and secrets of a client." Disciplinary Rule 4–101(B) provides:

"Except when permitted under DR 4–101(C) [e.g., when the client consents], a lawyer shall not knowingly:

"(1) Reveal a confidence or secret of his client.

"(2) Use a confidence or secret of his client to the disadvantage of the client.

"(3) Use a confidence of his client for the advantage of himself or of a third person, unless the client consents after full disclosure."

tions "are often interposed for tactical reasons," and that "even when made in the best of faith, such motions inevitably cause delay." *Board of Education v. Nyquist, supra,* 590 F.2d at 1246 (2d Cir.1979); see *Allegaert v. Perot,* 565 F.2d 246, 251 (2d Cir.1977).

■ Applying the foregoing criteria to the present case, the question of whether R & S should be disqualified as plaintiff's counsel turns on whether R & S were acting as attorneys for Artek or Dynatech when it was consulted by Leonhardt in 1980. The other two criteria (substantial relationship of subject matter and access to confidential information) appear to have been met. There is a substantial relationship between the subject matter of Leonhardt's 1980 consultation of R & S (i.e., Dynatech's alleged wrongdoing) and the present lawsuit, and Leonhardt furnished R & S with privileged information, including the Crowell & Moring opinion letter. On the other hand, on the present record R & S's status as Artek's general counsel prior to 1976 appears to have no significant relationship to the subject matter of the present case, which is based on events that did not occur until 1979, long after R & S had been terminated as Artek's general counsel and had in September 1976 returned Artek's files to it.

■ The crucial issue, therefore, is whether R & S was consulted by Leonhardt in 1980 on behalf of Artek or Dynatech, as the defendants (except Leonhardt) contend, or on behalf of Leonhardt individually and the minority stockholders, as plaintiff argues. If a confidential attorney-client relationship existed in 1980 between R & S and Dynatech or Artek, R & S must be disqualified from acting as plaintiff's counsel in the present case. If, on the other hand, R & S was consulted on behalf of Leonhardt individually or the minority public stockholders, no such disqualification is required.

■ A "corporate attorney"—whether an in-house lawyer or a law firm that serves as counsel to the company—owes a duty to act in accordance with the interests of the corporate entity itself. His client is the corporation. See ABA Code, Ethical Consideration 5–18; ABA Com. on Professional Ethics, Informal Opinion No. 1056 (1968); Note, *Developments in the Law— Conflicts of Interest in the Legal Profession,* 94 Harv.L.Rev. 1244, 1336 (1981). He may not serve the corporation in a particular matter and then represent a plaintiff in a suit against it or its officers in a substantially related matter. See *Hall v. A Corp.,* 453 F.2d 1375 (2d Cir.1972), *affirming Doe v. A Corp.,* 330 F.Supp. 1352 (S.D.N.Y.1971); see also *Trone v. Smith,* 621 F.2d 994 (9th Cir.1980); *Cannon v. U.S. Acoustics Corp.,* 398 F.Supp. 209, 221–29 (N.D.Ill.1975), *aff'd in relevant part,* 532 F.2d 1118 (7th Cir. 1976); ABA Com. on Professional Ethics, Informal Opinion No. 516 (1962), No. 1056 (1968); Note, *supra,* 94 Harv.L.Rev. at 1345; cf. *Chugach Electric Ass'n v. United States District Court,* 370 F.2d 441 (9th Cir.1966), *cert. denied,* 389 U.S. 820, 88 S.Ct. 40, 19 L.Ed.2d 71 (1967).

■ However, when conflicts arise among factions within a corporation and its counsel is unable to represent all factions, since to do so would be to represent "differing interests," ABA Com. on Ethics and Professional Responsibility, Code of Professional Responsibility, Ethical Consideration 5–14; see *Yablonski v. United Mine Workers,* 448 F.2d 1175 (D.C.Cir.1971) (per curiam), an individual member of management or of the board of directors has the right to seek the advice of an attorney who does *not* represent the corporation as an entity but who can instead represent the plaintiff in an individual capacity, or the faction of which the plaintiff is a member. In doing so, such individual member of management or of the board does not necessarily create an attorney-client relationship between the consulted attorney and the corporate entity itself. To so hold would be to penalize unnecessarily the intra-corporate dissident, or "whistleblower," since he/she would then be forced, if he/she were advised by his/her independent counsel that corporate management was violating the rights of stockholders and he/she then wished to take action, to hire a second attorney to bring suit.

The existence of an attorney-client relationship calling for disqualification must therefore turn on whether the dissident was acting for himself or a separate group rather than for the corporation in consulting outside counsel. Evidence that the corporate insider was seeking counsel on behalf of a minority faction and that the corporation itself was represented by separate counsel would militate against the conclusion that the attorney's client was the corporation itself. In such event there would be no conflict in an attorney's first advising a dissident member of management who supports a particular minority shareholder faction, and later representing the minority faction itself. Cf. *International Electronics Corp. v. Flanzer*, 527 F.2d 1288, 1292 (2d Cir.1975).

Plaintiff contends that it is the latter situation with which we are confronted here and that the July 1980 consultation was one in which Leonhardt, an individual dissident member of Artek's management, was concerned about misconduct on the part of Dynatech, the 60% majority stockholder of Artek, and its management, in violation of the rights of its minority public stockholders. He therefore sought independent counsel to protect those interests rather than be a party to the wrongdoing. In doing so he may also have wished to protect himself against liability for the alleged wrongful conduct which he sought to prevent. R & S, plaintiff argues, has thus never "switched sides" as counsel but has labored solely on the side of the minority public stockholders.

Appellees, on the other hand, argue that in consulting R & S Leonhardt was acting in his capacity as President of Artek, a subsidiary of Dynatech. In support of their position they point to the fact that his July 1980 letters to R & S enclosing the Crowell and Moring opinion and his own memorandum to R & S were on Artek letterhead, signed by him as "President," and that he suggested that R & S consider the possibility of legal actions that could be taken by Artek against Dynatech. Moreover, the Crowell and Moring opinion was expressly designated by Welsh, Dynatech's Vice-President and Artek's Chairman, as a "privileged and confidential attorney-client communication." However, the mere fact that Leonhardt was President of Artek would not automatically convert his consultation of R & S into a corporate one or bar R & S from representing the plaintiff if Leonhardt was in fact acting in the plaintiff's interests. Nor would Leonhardt's disclosure to R & S of confidential corporate documents, such as the Crowell & Moring letter, establish the existence of an attorney-client relationship between Dynatech or Artek and R & S. There is no suggestion that R & S induced Leonhardt as a corporate officer to furnish them with the documents. On the contrary, it would appear that Leonhardt acted voluntarily and unilaterally in doing so. If R & S was acting as Leonhardt's independent counsel, his decision to disclose the documents to it, whatever the consequences for him would be as a corporate dissident, would not convert R & S into counsel for Artek or Dynatech.

The situation here is similar to that faced in *R–T Leasing Corp. v. Ethyl Corp.*, 484 F.Supp. 950 (S.D.N.Y.1979), *aff'd mem.*, 633 F.2d 206 (2d Cir.1980), where the plaintiff moved to disqualify the defendant's attorneys on the ground that they had had access to confidential information in plaintiff's files, both during the acquisition of two of plaintiff's subsidiaries by another client of the attorneys, and during unsuccessful merger negotiations between that client and the plaintiff. We affirmed the denial of the motion after the district court had found that, since an attorney might come into possession of a party's confidential documents through means other than serving as that party's attorney, no attorney-client relationship could be inferred from mere access to documents. *Id.* at 953. Similarly, although Leonhardt's disclosure to a third party of the confidential opinion letter addressed to Dynatech may have been a breach of confidence on his part, this may not be used to change his relationship with R & S. On the contrary, his apparent motive and intent in consulting R & S was

not to gain legal help for Dynatech but to secure assistance *against* it.

Thus the record so far supports an inference that Leonhardt may have believed that he could not speak freely about his concerns to the general counsel of Artek and accordingly sought advice from independent attorneys about the proper course of action to be pursued by the minority shareholders. If this is what occurred, and if, as it appears, Leonhardt in fact consents to the representation by R & S of the plaintiff here, then absent proof of further relevant facts Leonhardt's status as President of Artek at the time of the consultation with R & S would not bar R & S from representing the plaintiff here.

■ Since the disqualification of R & S turns on whether that firm was acting in an attorney-client relationship with Leonhardt and minority Artek stockholders or with the corporate defendants when it was consulted in 1980 and no finding of fact was made by the district court on this crucial issue, we must remand the case to it for a finding on the issue, which will control the question of whether the order disqualifying R & S should be vacated. Since the parties sharply disagree on the factual issue, the court will probably find it necessary to hold an evidentiary hearing with respect to relevant facts, guided by the rule that the moving defendants bear the heavy burden of proving facts required for disqualification, *Government of India, supra*, 569 F.2d at 739. For instance, the record presently contains no affidavit or testimony by Leonhardt regarding the nature of his relationship with R & S in 1980 and his own individual interest as an Artek stockholder.

The case is remanded for further proceedings in accordance with the foregoing.