OPINION OF THE COURT
Harold Baer, Jr., J.
This motion to disqualify counsel is directed against one of *53 this country’s most prestigious law firms, Willkie Farr & Gallagher, and is made on behalf of the defendant, Bankers Trust Company, one of the country’s leading financial institutions. The presentations by both sides are of a quality one would naturally expect, but they have not alleviated the difficulty of the task before this court. Nonetheless, following a detailed analysis of the facts and the law, the motion is denied.
The motion was brought on in March of this year by order to show cause. Bankers Trust is the adviser to BT Investment Funds (BT), a mutual fund. Willkie Farr is counsel to BT. Maureen Bateman, Esq. of Bankers Trust’s legal department states that Willkie Farr gives advice to Bankers Trust and receives from it privileged attorney-client communications in connection with the activities of BT. These interchanges take place on a regular basis through Ms. Bateman, who has responsibility within Bankers Trust for the legal aspects of its actions on behalf of BT. Ms. Bateman calculates that she spends about 300 hours per year on legal work having to do with BT and has a "regular, ongoing and continuous” relationship with Willkie Farr. She deals with Willkie Farr attorneys, usually Burton Leibert and another attorney, on an average of twice a week. The communications with these attorneys "are frequently for the purpose of advising Bankers Trust on actions it takes in its capacity as advisor to the Funds.” Ms. Bateman considers these communications to be, and to have always been, privileged and confidential. Apart from a legal assistant, she is the only person within Bankers Trust with whom Willkie Farr normally deals with regard to BT.
In August 1988, plaintiff AMBAC Indemnity Corporation brought this action against Bankers Trust. The action arises out of Bankers Trust’s role as trustee for certain bonds issued in 1981 by several housing finance corporations in Texas. The aggregate principal amount of the bonds is almost $30 million. AMBAC issued municipal bond insurance for those bonds. Bankers Trust advised AMBAC that a semiannual interest payment due under the financing documents with respect to the bonds would be partially missed. That fear did not prove true on that occasion, but the second payment did encounter a shortfall and AMBAC was required to pay to Bankers Trust over $55,000 to cure the deficiency. In the meantime, AMBAC began this action seeking a declaratory judgment that any damages suffered by AMBAC were the result of a breach of contractual and fiduciary obligations by Bankers Trust as *54 trustee. The alleged breach included improper redemption of bonds, invasion of trust accounts, improper charging of fees and expenses, failure to assure required remittances from participants in the program and other similar contraventions of Bankers Trust’s obligations under the financing documents. The complaint demands indemnification from Bankers Trust for the life of the bonds for all losses resulting from this breach.
Willkie Farr has for some time served as outside general counsel for AMBAC. They were retained to work on this matter in the spring of 1988. Bankers Trust claims that this representation creates a conflict because "in substance” (to use Ms. Bateman’s words), Willkie Farr represents Bankers Trust with regard to BT. Ms. Bateman avers that she is the attorney responsible for advising the corporate trust department of Bankers Trust about its performance of its duties as trustee for the Texas bonds. Ms. Bateman notes that both representations have to do with Bankers Trust’s fiduciary responsibilities and states that it is possible that information communicated between her and Willkie Farr with regard to BT is or will become relevant to this case, wherein Willkie Farr is carrying on a battle against Bankers Trust and, in effect, against Ms. Bateman. Bankers Trust advised Willkie Farr of its concern about this perceived conflict, but was advised there was none.
AMBAC has submitted an affidavit from Burton M. Leibert, Esq., a partner at Willkie Farr and the attorney there in charge of the firm’s representation of BT. Mr. Leibert emphasizes that BT is in the business of offering investment portfolios, is an investment company owned by its shareholders and is supervised by a board of trustees and executive officers. Willkie Farr is counsel to BT, not to Bankers Trust. None of the trustees or executive officers of BT is a director or officer of Bankers Trust. Willkie Farr provides services for BT exclusively and BT is the entity to which Willkie Farr submits its bills. The trustees of BT chose to engage Willkie Farr as BT counsel (though Mr. Leibert concedes that this was done on the recommendation of Ms. Bateman). Willkie Farr’s work for BT includes registration of BT with the SEC as an investment company under the Investment Company Act of 1940 (15 USC § 80b-l et seq.), securities registration in various States and general corporate advice. Willkie Farr also represents BT when its trustees enter into professional service contracts with *55 third parties, such as accountants or Bankers Trust, the BT investment adviser and the custodian of BT assets.
Mr. Leibert concedes that he and others at Willkie Farr communicate with Bankers Trust, including its legal department. He states, however, that the purpose of such communications is "to monitor and ensure the performance by [Bankers Trust and the other] professional organizations of their contractual obligations” to BT, to "facilitate Bankers Trust’s performance of its investment advisory obligations”. These communications are done by Mr. Leibert as counsel to BT, which is charged for all time Mr. Leibert spends in such communications. Such are his contacts with Ms. Bateman.
The investment advisory agreement of 1986 between BT and Bankers Trust provides that Bankers Trust will furnish an investment program for BT on a continuous basis, will decide what securities will, be bought or sold by BT and will place orders with issuers, brokers or dealers. Bankers Trust is obliged to keep books and records for BT’s securities transactions and to report to the trustees as required.
The issue before the court is to what extent may counsel be disqualified for taking an adverse position in another case when the movant is not actually the client of that counsel. There is no dispute here that Willkie Farr is not counsel to Bankers Trust. The argument instead is that Bankers Trust, in practice and "in substance”, is a vicarious or de facto client of Willkie Farr and therefore entitled to demand of it total loyalty with respect to the confidentiality of all communications had with it in a professional capacity and that the firm not take any position against Bankers Trust in any litigation, as it has done in this case.
Before addressing the heart of the problem, the court will dispose of an argument that has received more attention from the litigants than it deserves. AMBAC contends that this motion is merely a stalling tactic and that Bankers Trust is guilty of loches. AMBAC makes much of the failure of defendant promptly to turn over documents demanded by plaintiff. AMBAC also claims that defendant should not be allowed, six months after this action began, to use a disqualification motion as a litigation tactic.
AMBAC’s first notice to produce documents called for production in late October 1988. Bankers Trust did not make its documents available until late December, when two attorneys from Willkie Farr spent two days culling 20,000 pages from *56 the documents for purposes of copying. Discussions were had between counsel concerning scheduling of depositions of the parties, but, according to plaintiff, defendant dragged its corporate heels here too. Instead, in March 1989, Bankers Trust obtained the order to show cause that brought on this motion.
This court is unable to conclude, as plaintiff so confidently does, that defendant is acting in bad faith in bringing this motion. This court, unfortunately, has daily and wearisome occasion to observe that attorneys do not always provide discovery completely and promptly. This does not mean, however, that Bankers Trust acted in bad faith. The character and vigor of the papers submitted in opposition by Willkie Farr on behalf of AMBAC and themselves undercut this contention and clearly indicate that, at the very least, this motion presents an authentic concern. Moreover, it is undisputed that, early in October 1988, White & Case advised Willkie Farr of that concern and the response requested by White & Case came almost a month later; and that it was early in December that White & Case wrote to pass on the request of Bankers Trust that Willkie Farr withdraw. Bankers Trust ought, perhaps, to have sought the order to show cause within the next weeks, once it became apparent that Willkie Farr would not withdraw. There appears, however, to have been a delay in the designation of documents as confidential. A delay of a month or two in making this motion does not establish bad faith. After document production on December 20 and 21 (which was done by Bankers Trust with reservation of its right to take action on the disqualification issue), little has happened in the case by way of discovery that would suggest a motive for obstruction by Bankers Trust.
The foregoing also undermines plaintiffs contention that loches should doom the motion to disqualify. Plaintiff and Willkie Farr have known of the issue since the beginning of last October. They cannot claim that they have been misled or lulled into letting down their guard by virtue of defendant’s delay, which, as noted, is less serious than plaintiff would have this court believe.
A motion of this kind involves a clash of significant interests. On the one hand, there is the right of a client to the services of the attorney of his choice, a right that plaintiff here strongly claims. On the other hand, there is an important interest, including a public interest, in assuring that clients can repose their trust and their intimate confidences in attorneys who will not use that trust and those confidences *57 against them. It is also important to our legal system that it be perceived to be fair and one that does not misuse those who resort to it in an effort to obtain justice. (See generally, Developments in the Law — Conflicts of Interest in the Legal Profession, 94 Harv L Rev 1244 [1981.) These considerations must be balanced sensitively. The avoidance of conflicts is so important, though, that the mere fact that, as here, a firm had no intention of acting improperly does not dispose of the issue. (Desbiens v Ford Motor Co., 81 AD2d 707 [3d Dept 1981].) As the Court of Appeals has said: "[Attorneys historically have been strictly forbidden from placing themselves in a position where they must advance, or even appear to advance, conflicting interests * * *. This prohibition was designed to safeguard against not only violation of the duty of loyalty owed the,client, but also against abuse of the adversary system and resulting harm to the public at large.” (Greene v Greene, 47 NY2d 447, 451 [1979].)
There is no question in this case that Bankers Trust is not the actual client of Willkie Farr, that there exists no formal attorney-client relationship between the two. Willkie Farr, in the brief it has submitted on behalf of AMBAC, appears to argue that this fact disposes of Bankers Trust’s motion and that there is no need for this court to consider whether a vicarious or de facto attorney-client relationship subsists between the parties. If the matter were truly so simple, why has Willkie Farr submitted another 20 pages of legal analysis and various supporting affidavits and why has Bankers Trust and White & Case gone to so much trouble? In fact, the matter is not so simple, as demonstrated by Glueck v Jonathan Logan, Inc. (653 F2d 746 [2d Cir 1981]). Understandably, Willkie Farr seeks to downplay this case but acknowledges that the Second Circuit has recognized the propriety of conducting an analysis of the issues raised by motions of this kind in a case involving a vicarious or de facto attorney-client relationship. (See, Fund of Funds v Andersen & Co., 567 F2d 225 [2d Cir 1977]; Nichols v Village Voice, 99 Misc 2d 822 [Sup Ct 1979, Stecher, J.]; New York Univ. v Simon, 130 Misc 2d 1019 [Civ Ct 1985].) This court may not halt its inquiry merely because there is a formal wall between Bankers Trust and Willkie Farr; it must instead examine the relationship between the two and consider whether the situation is such as to require disqualification of the attorney for a vicarious or de facto client.
Although Bankers Trust argues that the relationship among Bankers Trust, BT and Willkie Farr is, in substance, such as *58 to make Willkie Farr the attorney for Bankers Trust, the bank has provided little detail about its activities on behalf of BT. Ms. Bateman states that she furnishes privileged information to Willkie Farr, which provides legal advice to Bankers Trust through her. Yet she describes only very vaguely the nature of the work she performs in regard to BT and thus furnishes this court with only a bare hint of what her dealings with Willkie Farr in reality involve. Ms. Bateman’s greatest specificity comes when she states that she has a regular and continuous relationship with Willkie Farr and communicates about "fiduciary and disclosure matters relating to the Funds,” which communications "are frequently for the purpose of advising Bankers Trust on actions it takes in its capacity as advisor to the Funds.” It would be anomalous, perhaps even Kafkaesque, to require that, in order for a client to obtain disqualification of an attorney where disclosure of confidential and privileged information is threatened, the client must disclose that very information. But the burden on this motion is on Bankers Trust (Evans v Artek Sys. Corp., 715 F2d 788, 794 [2d Cir 1983]; New York Univ. v Simon, supra, at 1022), and Bankers Trust ought to have been able to provide this court with greater detail about the critical relationship at issue here without actually revealing the content of confidential communications.
From the papers, Bankers Trust and BT are formally distinct entities; the latter is not the mere alter ego of the former. BT has its own shareholders and its own officers and trustees. Willkie Farr bills BT for its legal work. In a formal sense, Ms. Bateman is acting as attorney for Bankers Trust, investment advisor, and Willkie Farr is counsel to BT, mutual fund. Bankers Trust urges this court to look at the real substance of this relationship. To be sure, the relationship is a very friendly one, and although Willkie Farr would have this court equate the role of Bankers Trust in the activities of BT to that of BT’s accountants, it appears from the investment advisory agreement that Bankers Trust’s activities, in contrast with those of the accountants, who are basically watchdogs, are at the heart of the operation of BT. It is Bankers Trust that provides the investment program that, in effect, BT is in business to sell to the public. Bankers Trust and BT seek and work to obtain the same goals. It is also clear, though, that the relationship is potentially a hostile one. If Bankers Trust does something untoward or is some manner violates the securities or other laws, it can expect that BT, on the advice *59 of Willkie Farr, will descend on Bankers Trust with its cohorts streaming in purple and gold.
The courts in ruling on motions such as this have sometimes looked to the expectations of the prospective or putative client, rather than to the formal understanding of the attorney. A classic instance of this is when a person has consulted an attorney with a view to hiring him. If that person had a reasonable expectation of professional confidentiality at the time of the consultation even if no attorney-client relationship ever eventuated the "client” will be held entitled to seek disqualification. (New York Univ. v Simon, supra.) In Westinghouse Elec. Corp. v Kerr-McGee Corp. (580 F2d 1311 [7th Cir], cert denied 439 US 955 [1978]), a firm was disqualified from an antitrust suit alleging a conspiracy in the uranium industry when the law firm represented the American Petroleum Institute, to which three defendants belonged. Those defendants had provided proprietary information to the law firm for a report that the firm was preparing for the Institute about, inter alla, the uranium business. There, the court concluded that those who furnished the information to the law firm had a reasonable basis for believing that they were effectively transmitting information to their attorneys. If an insurer hires an attorney to investigate a claim and the insured cooperates with the attorney pursuant to a cooperation clause in the policy, the attorney cannot represent an adverse interest against the insured in a related matter. (See, State Farm Mut. Auto. Ins. Co. v Walker, 382 F2d 548 [7th Cir 1967], cert denied 389 US 1045 [1968]; see also, Kearns v Lavery Porsche Audi Co., 745 F2d 600 [Fed Cir 1984], cert denied 496 US 1192 [1985].)
In this case, the person who is in contact with counsel is herself an attorney. As such, her understanding of the technical relationship among the parties is obviously greater than would be that of a corporate executive or other layman. Ms. Bateman clearly knows that Willkie Farr represents BT, not Bankers Trust, and that the positions of the two businesses are not identical. She also must be held to know that, while the relationship is a very friendly one, it is potentially adverse. It appears to this court that Ms. Bateman is acting as attorney for Bankers Trust, while Willkie Farr is attorney for BT. Ms. Bateman’s reasonable expectations — and thus not purely subjective ones — must be considered in light of these facts.
In Glueck v Jonathan Logan, Inc. (supra), the Second Circuit *60 considered the standard that should be applied when a vicarious or de facto relationship is claimed. The court noted that the standard it had announced in Cinema 5 v Cinerama, Inc. (528 F2d 1384 [2d Cir 1976]), for concurrent representations, was a very stringent one. In Cinema 5, where there was an alleged conflict by virtue of concurrent adverse representation of two actual clients, the court held that "adverse representation is prima facie improper * * * and the attorney must be prepared to show, at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation.” (528 F2d, supra, at 1387.) The court there had held that the "substantial relationship” test (i.e., between the subject matters at issue in cases of alleged conflict) did not represent a sufficiently high standard. In the case before this court, counsel for Bankers Trust places heavy reliance upon cases like Cinema 5, while Willkie Farr emphasizes cases involving the "substantial relationship” test, which are generally cases in which disqualification is sought on the basis of past representation. In Glueck, the Court of Appeals concluded that where the representation that gives rise to the motion is not that of the traditional attorney-client relationship, the court should not apply the Cinema 5 test, which imposes "a burden so heavy that it will rarely be met” (653 F2d, supra, at 749). That burden "is properly imposed when a lawyer undertakes to represent two adverse parties, both of which are his clients in the traditional sense.” (Supra, at 749.) Instead, the court applied the "substantial relationship” test to determine whether the burden set out by Cinema 5 should be imposed. If the "subject matter of a suit is sufficiently related to the scope of the matters on which a firm represents [the nontraditional 'client’] as to create a realistic risk either that the plaintiff will not be represented with vigor or that unfair advantage will be taken of the defendant”, disqualification will be required. (Supra, at 750.) The Second Circuit held that, under this test, a law firm would be disqualified from representing an individual in a suit against a corporation one division of which was a member of an incorporated trade association that was a client of the law firm since there was a similarity between the subject matter of the two representations.
Here, Bankers Trust argues that there is great similarity between the subject matter of the Bankers-Willkie Farr-BT relationship and the instant lawsuit. The similarity is founded upon the fact that (a) both matters concern the fiduciary *61 activities of Bankers Trust and (b) Ms. Bateman is counsel to Bankers Trust in both matters. It seems to this court that Bankers Trust overstates the similarity.
It is no doubt true that the AMBAC lawsuit and Bankers Trust’s role as investment adviser to BT concern the fiduciary activities of the bank. But this element common to these two cases of professional activity by the bank is also apt to be present in many other transactions and matters in which the bank is involved. Indeed, a great part of what the bank does will probably fall within this category, so broad is its reach. As to Ms. Bateman, she is present as attorney for Bankers Trust, not as a "front-line” actor in the activities in issue. The presence of Ms. Bateman is less important than the nature of the activities involved in the two representations, and whether, as a result, there is a realistic risk that Bankers Trust will be unfairly used by Willkie Farr in the bank’s work for BT so as to assist Willkie Farr in its representation of AMBAC.
The court notes that Mr. Leibert, in his affidavit on behalf of plaintiff, avers that he does not communicate with the corporate trust department, which is the branch of the bank involved in the Texas transactions, knows nothing of the bank’s role in the Texas bond issue and knows nothing of Ms. Bateman’s dealings with the department. Ms. Bateman herself acknowledges that she is the only attorney with whom Willkie Farr regularly deals in its legal work on behalf of BT and that the only other person with whom Willkie Farr would normally deal is a legal assistant who works for her. This would appear to narrow very considerably the funnel through which confidential information important to the AMBAC case might filter to Willkie Farr. Furthermore, the subject matter of the lawsuit and the Bankers Trust-BT work — and by this the court means the essence of these and not merely whether there is some broad adjective that can possibly be used to characterize both — are not very similar. With respect to BT, the bank is acting as an investment advisor to a mutual fund. As such, its job is to create and maintain an investment program for the fund; to follow the markets and general economic developments and decide what securities BT should sell and choose what securities BT should buy in order to enhance the financial position of BT shareholders; to place orders for securities directly with issuers, brokers or dealers; *62 and to keep books and records with respect to these securities transactions and to report about them to the trustees as required. The allegations of the AMBAC complaint concern quite different events. The subject of the case is a 1981 bond issue in Texas. The wrongs alleged to have been done by Bankers Trust are a breach of contract and violations of the bank’s duties as trustee. Those violations and that breach, in particular, include improper redemption of bonds, invasion of certain trust accounts, improper charging of fees and expenses, failure to assure required remittances and other like failures to fulfill obligations defined in the financing documents. This case does not involve the actions of an investment advisor and is not based on the securities laws or, in particular, the Investment Company Act of 1940 (15 USC § 80b-l et seq.). The time and circumstances, the locus of the activity, the nature of the work performed as trustee for the bonds, the obligations of the bank defined by the financing documents and the nature of the allegations made in the complaint in this case have little resemblance to the subject matter of the Bankers Trust-BT relationship. If AMBAC in pursing its action were to seek documents relating to the Bankers Trust-BT business, to ask questions on deposition about the business or otherwise to seek discovery concerning it, an attorney for Bankers Trust would undoubtedly rush to this court and demand a protective order with respect to that discovery on the grounds that it was irrelevant and this court would grant such an order. There is simply very little relationship between this case and the Bankers Trust-BT business and what relationship there is can hardly be described as "substantial”. (See, Satellite Fin. Planning Corp. v First Natl. Bank, 652 F Supp 1281 [Del 1987]; GAF Corp. v Heyman, 559 F Supp 748 [SD NY 1983]; C.A.M. v Marks Music, 558 F Supp 57 [SD NY 1983]; Nichols v Village Voice, 99 Misc 2d 822, supra.) There is little risk that confidential and privileged information that might be helpful to AMBAC and damaging to Bankers Trust will be spilled through the very narrow conduit to Willkie Farr that exists in Bankers Trust’s dealings with the law firm in the person of Ms. Bateman. As a trained professional, she will not reveal, such information to Willkie Farr, which information is irrelevant to her dealings with the firm as counsel to BT and to the Bankers Trust-BT relationship. No one else will deal with the law firm (save her legal assistant). The risks of an exploitation of the "attorney-client relationship” between the bank and Willkie Farr to the benefit of AMBAC are *63 not realistic and genuine. The court thus concludes that, a "substantial relationship” not having been shown, the Cinema 5 test will not be imposed upon AMBAC.
Defendant’s motion to disqualify Willkie Farr & Gallagher as counsel to plaintiff in this action is accordingly denied.