**In re CALDOR, INC.—NY, The Caldor Corporation, Caldor, Inc.—CT, et al., Debtors.**

**Bankruptcy No. 95–B–44030.**

United States Bankruptcy Court, S.D. New York.

Feb. 27, 1996.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City, pro se.

Proskauer Rose Goetz & Mendelsohn L.L.P., Marguerette N. Hosbach, New York City, for Ernst & Young L.L.P.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for debtor.

Zalkin, Rodin & Goodman, New York City, for Chemical Bank as Agent for Pre–Petition Secured Lenders.

*MEMORANDUM DECISION ON OBJECTION BY UNITED STATES TRUSTEE TO THE PROPOSED RETENTION OF OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C., AND ERNST & YOUNG LLP AS COUNSEL AND ACCOUNTANTS AND FINANCIAL ADVISORS, RESPECTIVELY, TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS*

JAMES L. GARRITY, Jr., Bankruptcy Judge.

Bradlees and Caldor (as those terms are defined below) are mid-to high-end discount retail merchandisers with chapter 11 cases pending in this court. By court order, Bradlees' Official Committee of Unsecured Creditors (the "Bradlees Committee") retained Otterbourg, Steindler, Houston & Rosen, P.C. ("Otterbourg"), as its counsel and Ernst & Young LLP ("Ernst", with "Otterbourg" collectively to be referred to as the "Professionals"), as its accountants and financial advisors. Caldor's Official Committee of Unsecured Creditors (the "Caldor Committee", with the Bradlees Committee collectively to be referred to as the "Committees") has moved pursuant to § 1103 of the Bankruptcy Code (the "Code") for leave to retain the Professionals in these cases. The United States Trustee (the "Trustee") objects to the motion alleging that the proposed retention is barred under § 1103(b) because the Committees are adverse to one another inasmuch as Bradlees and Caldor are competitors. The Trustee advocates that position notwithstanding that three members of the Bradlees Committee presently sit on the Caldor Committee and Bradlees and Caldor have retained the same accountants, all without objection by the Trustee. For the reasons stated herein the Trustee's objection is overruled, and the Committee is authorized to retain the Professionals.[1]

*Facts*

Except as otherwise noted, the facts herein are taken from a stipulation among the Pro-

1. Our subject matter jurisdiction of this matter is predicated on 28 U.S.C. §§ 1334(b) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

fessionals and Trustee. On June 25, 1995, Bradlees Corp. and certain affiliated companies (collectively, "Bradlees") filed separate petitions under chapter 11 of the Code in this district. Pursuant to §§ 1107 and 1108 of the Code, Bradlees has continued in possession and control of its business and assets as a debtor in possession. On July 6, 1995, after the initial meeting of creditors, the Trustee appointed the Bradlees Committee. By court orders (Lifland, C.J.) dated July 17, 1995 and August 15, 1995, respectively, the Bradlees Committee retained Otterbourg as its counsel and Ernst as its accountants and financial advisors.

On September 18, 1995, Caldor Corporation and 21 affiliated corporations (collectively, "Caldor") filed separate petitions for relief under chapter 11 of the Code in this district. On September 27, 1995, immediately after the initial meeting of Caldor creditors, the Trustee appointed the Caldor Committee. As empaneled, four members of the Caldor Committee also served as members of the Bradlees Committee: Mattel Toys, VF Corporation, American Credit Indemnity and United Food & Commercial Workers. On or about November 6, 1995, VF Corporation resigned from the Caldor Committee. *See* Affidavit of Kurt J. Wolff sworn to on December 7, 1995, and submitted in opposition to the Trustee's objection, ¶ 13. At the initial creditors meeting, and in the presence of representatives of the Trustee, Caldor advised Caldor Committee members that it had no objection to membership overlaps with the Bradlees Committee or to the selection in this case of professionals who might represent the Bradlees Committee. As the docket in each case reflects, on the consent of the Trustee, both debtors have retained Deloitte & Touche LLP to serve as their accountants. At the initial meeting, the Caldor Committee selected Otterbourg as its counsel following interviews of, and presentations by, eight law firms. Prior to its selection, Otterbourg disclosed orally and in writing its representation of the Bradlees Committee. The Caldor Committee solicited proposals from Ernst and three other firms to serve as its accountants and financial advisors. Ernst submitted a Proposal to Serve which outlined its qualifications and experience in the field of

retail restructuring, and disclosed its engagement by the Bradlees Committee, as well as certain other retailers. The Caldor Committee selected Ernst after interviewing each of the solicited firms. During its interview Ernst again disclosed its representation of the Bradlees Committee. Ernst also advised that, if retained in this case, it would staff the case with personnel having no connection with the Bradlees case. As of the commencement of the Caldor case it instituted an "information barrier" shielding the Ernst personnel slated to work on the Caldor case from any Bradlees matters. After concluding its interviews, the Caldor Committee selected Ernst. Since that time, at Caldor's request, Otterbourg, Ernst and each committee member have executed confidentiality stipulations.

The Trustee objects to the Professionals' retention. The Caldor Committee has been provided with copies of that objection and has reaffirmed its application to retain them. It believes that its functioning will be substantially harmed if it is not permitted to be served by the Professionals. Caldor supports the committee, maintaining that if the Trustee's objection is sustained the chapter 11 cases will be disrupted resulting in unwarranted delay in the reorganization process. The pre-petition bank group also supports the committee contending that a change of professionals at this time would be extremely detrimental to Caldor's reorganization effort, and would cause unacceptable delay.

*Discussion*

█ A creditors' committee stands as a fiduciary to the class of creditors it represents. *E.g., Woods v. City National Bank,* 312 U.S. 262, 268–69, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941); *Bohack Corp. v. Gulf & Western Indus.,* 607 F.2d 258, 262 n. 4 (2d Cir.1979); *In re Celotex Corp.,* 123 B.R. 917, 920 (Bankr.M.D.Fla.1991). Its principal function "is to advise the creditors of their rights and the proper course of action in the bankruptcy proceedings." *Bohack Corp. v. Gulf & Western Indus.,* 607 F.2d at 262 n. 4 (citations omitted). Accordingly, pursuant to § 1103(c), an official committee may:

(1) consult with the trustee or debtor in possession concerning administration of the case;

(2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

(3) participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan; . . . .

11 U.S.C. § 1103(c). To that end, an official committee may "select and authorize the employment . . . of one or more attorneys, accountants, or other agents, to represent or perform services for such committee." 11 U.S.C. § 1103(a). Professionals retained by an official committee owe fiduciary duties to the committee. *E.g., In re Arlan's Dept. Stores, Inc.,* 615 F.2d 925, 943–44 (2d Cir. 1979); *In re Mesta Mach. Co.,* 67 B.R. 151, 153, 158 (Bankr.W.D.Pa.1986). *See also In re Oliver's Stores, Inc.,* 79 B.R. 588, 597 (Bankr.D.N.J.1987) ("the integrity of the bankruptcy system demands that the professionals serving the committee not place themselves in a situation where their independence, loyalty and integrity can be questioned by the unsecured creditor body whom they represent").

■ Public policy favors permitting parties to retain professionals of their choice. *In re Codesco, Inc.,* 18 B.R. 997, 999 (Bankr. S.D.N.Y.1982) (" '[o]nly in the rarest cases should the trustee be deprived of the privilege of selecting his own counsel . . .' ") (quoting *In re Mandell,* 69 F.2d 830, 831 (2d Cir.1934)). *See In re Brennan,* 187 B.R. 135, 150 (Bankr.D.N.J.1995) (there is a presumption in favor of a party's right to an accountant of its choice). Nonetheless, the Code limits an official committee's right to retain professionals to assist it in fulfilling its statutory duties, as follows.

An attorney or accountant employed to represent a committee appointed under section 1102 of this title may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case. Representation of one or more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest.

11 U.S.C. § 1103(b). The Trustee construes the phrase "adverse interest in connection with the case" to apply when the professional represents, in any context—whether or not in the underlying bankruptcy case—an entity that has an interest adverse to that of the committee, whether or not the interest arises in the bankruptcy case. The Trustee contends that because Bradlees and Caldor compete in the same market niche, the interests of the Committees are adverse and the Professionals are barred from representing the Caldor Committee, even though Bradlees does not have a claim in and is not a party to this proceeding. Alternatively, they contend that Otterbourg's retention is barred under Canons 4, 5 and 9 of the Code of Professional Responsibility. The Professionals argue that the interests of the Committees are not adverse because Caldor and Bradlees are not creditors of each other and the Committees do not compete with one another. They also contend that, in any event, there are no disqualifying conflicts here because they do not seek to represent the Bradlees Committee in connection with this case. Finally, Otterbourg contends that its retention is not barred by the Code of Professional Responsibility.

■ Under § 327(a) of the Code, a debtor may retain an attorney (i) who does not hold or represent an interest adverse to the estate and (ii) who is disinterested. The Trustee argues that we should be guided by decisions under § 327(a) in determining whether the Bradlees Committee has an "adverse interest" for purposes of § 1103(b). The Professionals deny that § 327(a) is relevant to our analysis arguing that Code § 1103(b) does not reference that section and does not otherwise mandate that a proposed attorney or accountant not hold an adverse interest or be disinterested. However, under § 328(c) of the Code, a professional person retained under § 1103 will be denied allow-

ance of compensation and reimbursement of expenses if, at any time during that person's employment, he is not a disinterested person or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed. *See* 11 U.S.C. § 328(c). Thus, § 327(a) is relevant herein and it is appropriate now to consider whether the Professionals meet the standards enunciated therein. *See, e.g., In re Celotex Corp.,* 123 B.R. at 920. In relevant part, a "disinterested person" is one who "does not have an interest materially adverse to the interest of the estate or of any class of creditors … by reason of any direct or indirect relationship to, connection with, or interest in, the debtor…." 11 U.S.C. § 101(14)(E). Because §§ 101(14) and 327(a) overlap, the two prongs of § 327(a) are satisfied when the professional to be retained is found to be a "disinterested person". *In re Martin,* 817 F.2d 175, 179 n. 4 (1st Cir.1987). *See In re BH & P, Inc.,* 949 F.2d 1300, 1314 (3d Cir.1991); *In re Leslie Fay Companies, Inc.,* 175 B.R. 525, 532 (Bankr.S.D.N.Y.1994); *Roger J. Au & Son, Inc. v. Aetna Ins. Co.,* 64 B.R. 600, 604 (N.D.Ohio 1986). The term "adverse interest" is not defined in the Code and whether one exists is determined on a case by case basis. *E.g., In re BH & P, Inc.,* 949 F.2d at 1315–16. Generally an "adverse interest" takes the form of a competing economic interest tending to diminish estate values or to create a potential or actual dispute in which the estate is a rival claimant. *See In re TWI International, Inc. v. Vanguard Oil and Service Co.,* 162 B.R. 672, 675 (S.D.N.Y.1994); *In re Star Broadcasting, Inc.,* 81 B.R. 835, 838 (Bankr.D.N.J.1988); *In re Roberts,* 46 B.R. 815, 826–27 (Bankr. D.Utah 1985). In determining if a disqualifying conflict exists, our inquiry is whether the Professionals' representation of the Bradlees Committee will create "either a meaningful incentive to act contrary to the best interest of the [Caldor Committee]—an incentive sufficient to place those parties at more than acceptable risk—or the reasonable perception of one." *In re Martin,* 817 F.2d at 180. Stated differently, "if it is plausible that the representation of [the Bradlees Committee] will cause [the Professionals] to act any differently than they would without

that … representation, then they have a conflict and an interest adverse to the [Caldor Committee]." *In re Leslie Fay Companies, Inc.,* 175 B.R. at 533.

The Trustee's concludes that there is an actual or potential conflict of interest barring the Professionals' retention by the Caldor Committee because Bradlees and Caldor allegedly are "mirror image competitors" whose reorganizations are "bound to" involve competition in one of the following scenarios: (i) a potential merger of the two retailers; (ii) a potential buyout of one of the two retailers by a national discounter like Wal–Mart Stores, Inc. ("Wal–Mart"), Kmart or Target Stores, Inc. ("Target"); (iii) a possible liquidation of one of the retailers; and (iv) competition between the two retailers in purchasing the stores of other troubled discounters.

Caldor and Bradlees operate virtually the same number of stores (136 and 166, respectively) in practically all of the same states. Both operate in New York, New Jersey, Pennsylvania, Rhode Island, Massachusetts, Connecticut, New Hampshire and Virginia. Caldor has operations in Maryland and Delaware while Bradlees operates in Maine. In states where their operations overlap, 92 of Caldor's 166 stores are within a five to ten mile radius of a Bradlees store. Existing stores are approximately the same size, with Caldor stores averaging approximately 75,-750 square feet and Bradlees stores averaging approximately 73,000 square feet. Their merchandising strategy is similar with both offering a mix of soft-line and hard-line goods and soft home furnishings. Both count Jamesway, Clover, Ames, Wal–Mart and Kmart as competitors. They pay close attention to one another's operations. For example, they monitor and respond as appropriate to the promotional campaigns of each other and numerous other retail stores. Thus, the stipulated record amply demonstrates that Caldor and Bradlees are economic competitors and in that sense, they are adverse to one another. However, the parties agree that neither the debtors nor the Committees hold or assert claims against each other and none assert competing claims to an economic interest. Thus, notwithstanding debtors' sta-

tus as economic competitors, the Committees do not hold disqualifying "adverse interests" for purposes of § 1103(b), because neither the Committees, nor the debtors, are likely to become "rival claimants." *In re Tri Mfg. & Sales Co.*, 51 B.R. 178, 179–80 (Bankr. S.D.Ohio 1985), cited by the Trustee, does not mandate a different result. In that case, the court denied a creditor committee's request to retain counsel who was representing debtor's former general manager, a shareholder then employed as a salesman by debtor's competitor. In doing so, it relied on *In re Roberts*, 46 B.R. 815 (Bankr.D.Utah 1985). That court construed the phrase "hold an adverse interest" to mean

> for two or more entities (1) to possess or assert mutually exclusive claims to the same economic interest, thus creating either an actual or potential dispute between the rival claimants as to which, if any, of them the disputed right or title to the interest in question attaches under valid and applicable law; or (2) to possess a predisposition or interest under circumstances that render such a bias in favor of or against one of the entities.

*Id.* at 826–27. Focusing on the second prong of the *Roberts* definition, the *Tri Mfg.* court found a disqualifying conflict because "a competitor of debtor will have a different 'predisposition' in evaluating the desirability of the continuance of debtor's business than will an ordinary creditor." 51 B.R. at 180. *Tri Mfg.* creates a *per se* bar to a professional's simultaneous representation of a creditors' committee and an economic competitor of the debtor, or at least an employee of such a competitor. However, most courts eschew a *per se* rule in favor of analysis premised upon the totality of the circumstances in a particular case. *E.g., In re BH & P, Inc.*, 949 F.2d at 1315–16; *In re Star Broadcasting, Inc.*, 81 B.R. at 844; *In re Hoffman*, 53 B.R. 564, 566 (Bankr.W.D.Ark.1985). Had Congress sought to prohibit such a representation, it presumably would have done so. *Compare* 11 U.S.C. § 101(14)(E) (a person is *per se* not "disinterested" if he has had a direct or indirect relationship to, connection with, or interest in the debtor or an investment banker for any outstanding security of the debtor or for any security of the debtor within three years of the petition date or for any other reason). In any event, *Tri Mfg.* is inapposite because the Trustee has stipulated that the Bradlees Committee does not compete with Caldor or the Caldor Committee, and the Trustee has not otherwise articulated why the Bradlees Committee has a predisposition against Caldor or its committee. Rather, the overlap of committee membership suggests that the Bradlees Committee, or at least portions thereof, is likely to be favorably disposed towards Caldor's reorganization.

Although we could devise a set of facts under which the Trustee's concerns enumerated above regarding "potential" competition among the debtors, and thus the Committees, might prove valid, the record does not support those concerns. "[I]nterests are not considered 'adverse' merely because it is possible to conceive a set of circumstances under which they might clash." *In re Leslie Fay Companies, Inc.*, 175 B.R. at 532. *See also In re Martin*, 817 F.2d at 183 ("[H]orrible imaginings alone cannot be allowed to carry the day. Not every conceivable conflict must result in sending counsel away to lick his wounds."); *TWI Intern., Inc. v. Vanguard Oil and Service Co.*, 162 B.R. at 675 (" '[M]erely hypothesizing that conflicts may arise is not sufficient basis to warrant the disqualification' of an attorney.") (quoting *In re Stamford Color Photo Inc.*, 98 B.R. 135, 138 (Bankr.D.Conn.1989) (citing *In re Martin*, 817 F.2d at 183)); *In re Kelton Motors, Inc.*, 109 B.R. 641, 650 (Bankr.D.Vt.1989) ("mere hypothetical conflicts do not meet the heavy burden of proof to warrant disqualification of DIP's attorney") (citing *In re Stamford Color Photo Inc.*, 98 B.R. at 138).

The evidence relied on by the Trustee in support of its assertion that Caldor and Bradlees are merger candidates consists of the following:

- On April 4, 1995, executives from Caldor and Bradlees conducted very preliminary discussions regarding the possibility of some sort of combination of the two entities. After that meeting, Caldor was notified that Bradlees did not want to pursue further discussions.

- On November 14, 1995, executives from Bradlees and Caldor met again to conduct very preliminary discussions regarding some sort of combination of the two entities. Subsequent to that meeting, Bradlees' bankruptcy counsel, Stuart Hirschfield, Esq., was quoted in the press as stating that "Caldor merger overtures to Bradlees are now a dead issue."

- There is a possibility that Caldor and Bradlees will meet once more to discuss the possibility of a merger.

- Reports by financial analysts recommending merger and press reports discussing those recommendations.

- A report that in October 1995, Peter Thorner, Bradlees' President and Chief Financial Officer was approached by a representative of a major New York investment banking firm who suggested a business combination with Caldor and representative of a large New York commercial bank who indicated that the bank would be interested in funding a "joint plan of reorganization" for the two companies.

The Trustee concedes that published reports in October 1995 quote Don Clarke, Caldor's Chief Executive Officer, as stating that Caldor intends to emerge from reorganization as an independent entity. On this record we conclude that while certain financial analysts believe a merger or some other combination of the retailers is in the retailers' best interest, neither debtor concurs with that assessment at this time and neither debtor is pursuing that possibility, seriously or otherwise, at this time. Moreover, we find no merit to the Trustee's assertion that the Professionals alleged duty to investigate whether a merger, acquisition or other arrangement with Bradlees is in the best interests of the estate creates an actual conflict of interest disqualifying them from representing the Caldor Committee. As noted previously, a committee is authorized, but not directed, to investigate the operation of the debtor's business and the desirability of the continuance of such business. *See* 11 U.S.C. § 1103(c)(2). However, the Professionals can undertake that analysis without specific reference to Bradlees, Hills, Clover or any other Caldor

competitor, and there is no evidence that the Professionals cannot or will not do so.

The Trustee's concern about a possible buyout of one of the two retailers by Wal–Mart, Kmart, or Target is even more speculative. As support for that thesis, the Trustee relies on the following publicly available information:

- The 10–K report filed on behalf of Wal–Mart Stores, Inc. for the year ended January 28, 1995, reported that Wal–Mart Stores, Inc. had become the largest retailer in America with net sales of approximately $82,000,000,000, through its operation of 1,990 Wal–Mart stores, 428 Sam's Club stores and 143 Wal–Mart Supercenters. In 1989 Wal–Mart had 14 stores in the nine Northeastern states where Bradlees has store locations and the tén states where Caldor has its stores. By 1994, Wal–Mart increased its store locations in the same region to 188 and 187, respectively.

- In Dayton Hudson Corp.'s January 28, 1995 10–K report, Target Stores, Inc. is described as "an upscale discounter, providing quality merchandise at low prices in guest-friendly stores." Caldor's 10–K report for the year ended January 28, 1995, states that it "seeks to be the leading upscale discount retailer in its markets, positioning itself between the traditional discounter and the department store." At the beginning of 1995 Target did not have any stores in the states in which Caldor operates its stores.

Conspicuously absent from this "evidence" is any mention of Kmart or mention that either Wal–Mart or Target seeks to buy Caldor, Bradlees, or any other regional retailer.

The likelihood that one or the other retailer will liquidate is even more remote than the likelihood of a buyout by a national discounter. There is no evidence that Bradlees is even contemplating liquidation, and published reports in October 1995, quote Caldor's Don Clark as stating that Caldor will emerge from this case as an independent entity.

Finally, it is undisputed that in or about mid November 1992, Caldor outbid Bradlees for all or certain of six leases then held by

Alexanders Department Stores. Later that month, Caldor sold one such lease to Bradlees for approximately $16.5 million. Caldor concedes that one reason it sold that lease was because the site was in close proximity to an existing Caldor store. From these facts the Trustee posits a potential conflict among the retailers in purchasing the stores of other troubled retailers. However, there is no evidence that either entity is expanding its operations, or even intends to do so. On this record, the actions taken over three years ago by the retailers do not provide a basis for finding a potential conflict of interest among the Committees today.

 In sum, on this record, the Trustee's assertion of a disqualifying adverse interest among the Committees is rejected as the product of "hypothetical conflicts" and "horrible imaginings". *See, e.g., In re Stamford Color Photo, Inc.,* 98 B.R. at 138. However, even assuming, *arguendo,* that the interests of the respective Committees are adverse, there is no merit to the Trustee's objection to the Professionals' retention because those interests do not arise "in connection with the case." Section 1103(b) was enacted in its current form in 1984. Its predecessor read as follows:

A person employed to represent a committee appointed under § 1102 of this title may not, while employed by such committee, represent any other entity in connection with the case.

Prior to the 1984 amendment, a professional retained by an official committee under § 1103(b) was *per se* barred from representing any other entity in the case. *E.g., In re Saxon Indus., Inc.,* 29 B.R. 320, 321–22 (Bankr.S.D.N.Y.1983); *In re Combustion Equipment Associates, Inc.,* 8 B.R. 566, 568 (Bankr.S.D.N.Y.1981); *In re Proof of the Pudding, Inc.,* 3 B.R. 645, 647 (Bankr. S.D.N.Y.1980). The statute did not impose any limitations on the right of an attorney or accountant retained by an official committee to represent creditors of the debtor in matters unrelated to the case. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 104–05 (1977), *reprinted in,* 1978 U.S.C.C.A.N. 5787, 6065–6067 (1977) ("the bill requires that an attorney for a creditors' committee cease representation of creditors in connection with the case. It does not require the attorney to cease representation of the creditors in matters unrelated to the case"). The Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 358, 384 (1984), amended § 1103(b) by substituting the phrase "entity having an adverse interest" for the word "entity" in the first sentence and adding the second sentence. Thus, Congress eliminated the *per se* conflict rule by permitting an attorney or accountant simultaneously to represent the "committee and any other entity that does not hold in the case an interest adverse to that of the committee. The amended provision further clarifies that the simultaneous representation of the committee and of creditors of the same class as those on the committee does not *per se* constitute the representation of a prohibited adverse interest." *In re Roberts,* 46 B.R. at 825. *See also In re Rusty Jones, Inc.,* 107 B.R. 161, 163 (Bankr.N.D.Ill.1989).

The amendment did not alter then existing law barring counsel retained by an official committee from simultaneously representing an individual creditor and the creditors' committee if the individual creditor has retained counsel to litigate issues potentially adverse to the committee. *E.g., In re Oliver's Stores, Inc.,* 79 B.R. at 594; *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 655, 662 (Bankr.E.D.Pa.1987). Nor did it change the rule under the Code that a professional retained by an official committee can simultaneously represent an entity with an interest adverse to the committee, on matters not arising in the bankruptcy proceeding. That is what the court found in *Daido Steel Co., Ltd. v. Official Committee of Unsecured Creditors,* 178 B.R. 129 (N.D.Ohio 1995). In that case, the official creditors' committee of CSC Industries, Inc. and the Copperweld Steel Company sought an order continuing its retention of Brouse & McDowell ("Brouse"), as its counsel. Daido Steel ("Daido"), the debtors' largest creditor, objected to the motion because Brouse also represented the potential purchaser ("Purchaser") of all debtors' assets, in matters unrelated to the bankruptcy case. Separate counsel had been retained to represent the Purchaser in connection with the proposed

purchase of debtor's assets. The bankruptcy court granted the committee's application and Daido appealed arguing that the court erred in applying § 1103(b). The district court framed the issue on appeal as "whether § 1103(b) prohibits all simultaneous representation of a committee and an entity with an interest adverse to the committee or instead prohibits such representation only where the attorney represents the other entity on a matter related to the bankruptcy case." *Id.* at 131. The court held the latter to be the case. *Id.* at 132. Accordingly, because Brouse's representation of the Purchaser concerned matters unrelated to the bankruptcy case, the court approved Brouse's continued retention by the committee, notwithstanding that Purchaser's interest were adverse with those of the committee. *Id.* Daido also argued that Canons 5 and 9 of the Ohio Code of Professional Responsibility barred Brouse's retention but the district court refused to consider those assertions because Daido had not raised them in the bankruptcy court. *Id.* at 132.

In *Daido* the Purchaser's interests were adverse to the committee's because the Purchaser presumably sought to pay as little as possible for the debtors' assets in the face of committee efforts to maximize the purchase price. No similar conflict exists here because Bradlees has not and likely will not seek to purchase Caldor assets. Moreover, the Trustee has stipulated that Caldor and Bradlees are unrelated except that they compete in the same market niche, are not affiliated entities and do not hold claims against each other, and that the Bradlees Committee is not a creditor in this case. The Bradlees Committee's alleged interests in the Caldor case; i.e. as the fiduciary of the creditors of an economic competitor of Caldor, are not adverse to the Caldor Committee, and even if adverse, are so attenuated that they provide no basis for disqualifying the Professionals. Moreover, contrary to the Trustee's urging, *Daido* is relevant because, as explained below, Otterbourg's representation of the Caldor Committee does not violate Canons 4, 5 or 9 of the Code of Professional Responsibility.

The Trustee's construction of the statute violates settled principles of statutory construction because it effectively reads the phrase "in connection with the case" out of § 1103(b), leaving only consideration of whether an "adverse interest" exists. *See e.g., Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985) (it is an elementary canon of statutory construction that statute should be interpreted so as not to render one part inoperative) (citing *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979)). The *Daido* court correctly rejected a similar argument.

> The parties' dispute turns on whether the phrase 'in connection with the case' refers to the word 'represent' or the word 'interest'. . . .

> \* \* \* \* \* \*

> In interpreting § 1103(b), *Collier on Bankruptcy* states: 'With respect to attorneys and accountants, the committee may appoint such professional persons to represent the committee so long as any other party *represented* by such attorney *in connection with the case* does not have an adverse interest in the interests represented by the committee." 5 Collier on Bankruptcy, § 1103.0 at 1103–9 (15th ed. 1994) (emphasis added). Thus *Collier* suggests that the phrase 'in connection with' refers to the word 'represent'.

> The legislative history supports *Collier's* view. . . . Rather than prohibiting all dual representation in connection with the bankruptcy case, the section now prohibits only dual representation in connection with the case where the represented parties have adverse interests. Nothing suggests that the phrase 'in connection with the case' is to be given a meaning different than that it held prior to the [1984] amendment.

*Daido Steel Corp. v. Official Committee of Unsecured Creditors,* 178 B.R. at 131–32. If, as the Trustee alleges, a professional's representation of an entity whose *sole* interest in a case is as an economic competitor of the debtor (or as the fiduciary of the creditors of such a competitor), could give rise to disqualifying "adverse interest" under § 1103(b), the

statute would become unworkable. The Trustee seems to concede that not every economic competitor holds a disqualifying "adverse interest", thereby leaving the task of determining the level of competition which will create an "adverse interest" to the court. That analysis necessarily will require, in every case, a review of the relevant market(s)—if they can be determined—and the level of competition in those markets. The court simply does not have the resources or time to undertake that kind of study in each case. Neither the professionals nor the debtor's estate should be burdened with the costs associated with such an analysis. Moreover, the position taken by the Trustee in this case undermines its purported construction of the statute. Caldor sells numerous varieties of hard line and soft line goods and likely has hundreds of economic "competitors", including other discount retailers, as well as niche stores specializing in, for example, sporting goods or bed linens. The Trustee has stipulated that Caldor's competitors include such diverse retailers as Home Depot, Office Max, Sports Authority and Linens 'N Things. Nonetheless the Trustee has not inquired into either Otterbourg's or Ernst's relationship, if any, with those entities or any other Caldor "competitor". Moreover, in apparently singling out the Professionals relationships with Caldor and Bradlees, it has completely disregarded its approval of Caldor and Bradlees retention of the same accounting firm in these cases.

The Trustee argues that the Professionals' construction of the statute leads to the untenable result that we could not disqualify the Professionals even if an actual conflict were developing between the Committees, until the conflict became "connected" with the case, by which time the Committees and the case might have been prejudiced. However, the Code of Professional Responsibility [2] and the Rules of Professional Conduct of the American Institute of Certified Public Accountants ("AICPA Code") mandate that Otterbourg and Ernst, respectively, police themselves and disclose any developing conflict which may color their impartiality and/or

objectivity before it affects representation of the Caldor Committee. Disciplinary Rule ("DR") 5–105(B), promulgated under Canon 5 of the Code of Professional Responsibility, obliges counsel to discontinue multiple employment if "the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing differing interests . . . ." Pursuant to DR 5–105(C), an attorney may represent multiple clients if it is obvious that he can adequately represent the interest of each client "and if each [client] consents to the representation after full disclosure of the possible effect of such representation" on the attorney's exercise of independent professional judgment. Rule 102 of the AICPA Code mandates that certified public accountants maintain objectivity and integrity, be free from conflicts of interest, and not knowingly misrepresent facts or subordinate their judgments to others. If a conflict of interest develops during the course of an accountant's representation of a client, the accountant cannot continue to service the client unless the conflict is disclosed and consent is obtained from the relevant parties. *See* Affidavit of Thomas P. Kelley sworn to December 6, 1995, and annexed to Ernst Opposition to the Trustee's Objection ¶ 17 (citing Interpretation 102–2). Moreover, although Bankruptcy Rule 2014 only requires disclosure of conflicts of interest in connection with a professionals' initial retention, § 328(c) provides that to be compensated, the Professionals must maintain their disinterestedness and refrain from representing or holding an interest adverse to the estate with respect to the matter on which they are employed. *See* 11 U.S.C. § 328(c). *Compare In re Southmark Corp.*, 181 B.R. 291, 295 (Bankr. N.D.Tex.1995) (court order imposed continuing obligation to disclose conflicts as they arise during case). A strong undercurrent of the Trustee's objection is its concern that the Professionals will not police themselves and abide by their respective ethical mandates to

---

**2.** All references are to the Code of Professional Responsibility, as adopted in New York State.

*See* N.Y.Jud.Law app. at 350 (McKinney 1992).

disclose and address conflicts as they arise. Absent evidence of their failure or inability to abide by relevant ethical standards, and the reporting provisions under the Bankruptcy Rules and Code, we must presume that they will do so. The Professionals acknowledge the application of the relevant ethical standards. There is no evidence that either has or likely will violate them. Rather the evidence discloses that both take those obligations seriously because, in part, both have implemented information barriers, notwithstanding that the Committees do not possess adverse interests.

Ernst instituted an information barrier with respect to these matters on September 21, 1995, before it was retained by the Caldor Committee. At that time Ernst created separate teams for the two engagements. There is no overlap in staffing between the Caldor team and the Bradlees team. Ernst has instituted procedures to ensure that the two teams will not accidentally consult with the same persons, that work product will be retained separately, and that computer files cannot be inadvertently accessed. The services that Ernst is rendering to the Bradlees Committee are based in its New York office. Ernst's work for the Caldor Committee is based in its Atlanta office. The only exceptions, a retired Ernst partner who serves as a consultant, and a manager, are located in the New York office and have been advised as to the need for maintaining the strictest separation between the two engagements. Further, Ernst requires all of its professionals to comply with the requirements of the AICPA Code. Prior to Ernst's engagement by the Caldor Committee and before the institution of the information barrier, a member of Ernst's Bradlees team called the Atlanta office to obtain some publicly available information concerning an executive compensation matter that had arisen in a prior bankruptcy. Two accountants spent 3.2 hours responding to the request, which had nothing directly to do with Bradlees. All parties have stipulated that neither individual learned anything confidential.

Otterbourg deployed its information barrier on October 2, 1995, five days after its selection as Committee counsel, and completed its implementation by October 10, 1995. Otterbourg created two teams of professional employees (members of the Firm, associates and paralegals). One team renders professional services to the Bradlees Committee and the other team renders professional services to the Caldor Committee. Following Otterbourg's selection by the Caldor Committee on September 27, 1995, the following attorneys who, prior to that date, had recorded time in the Bradlees case, were assigned by Otterbourg to work either on the Caldor case or in connection with the Trustee's Objection to Otterbourg's retention by the Caldor Committee: Kurt J. Wolff, William M. Silverman, Scott L. Hazan, Richard J. Rubin, Alan Kardon and Rosanne A. Finkel. Since, October 10, 1995, they have not worked on any Bradlees matter. Between September 27, 1995 and October 10, 1995, these individuals recorded de minimis hours in the Bradlees case primarily in connection with the transfer of duties to different attorneys or with respect to the Trustee's objection.

If a conflict arises among the Committees, either or both can retain special counsel or financial advisors, as necessary. *See, e.g., In re Leslie Fay Companies, Inc.,* 175 B.R. at 537. The Trustee argues that retaining professionals to handle discrete matters will result in unnecessary delay and costs which would be prejudicial to the creditors. However, those issues will become relevant only if disqualifying a conflict arises, which, on this record, is a remote possibility. Those problems are far outweighed by the certain costs and delay to creditors and disruption to this case if the Professionals are disqualified at this time.

Finally, the cases cited by the Trustee do not support a different result. In *In re Proof of the Pudding, Inc.,* 3 B.R. 645, debtor was one of three related chapter 11 debtors asserting claims against each other. The creditors' committee appointed in each case sought to retain the same law firm ("Berzow") as counsel. *Id.* at 646. The bankruptcy court authorized Berzow's retention by the official committee in one case, but denied it in the remaining cases, finding that such proposed retention violated § 1103(b) because each committee potentially held an in-

terest in each case adverse to the others' committees by virtue of the fact that each debtor was a creditor of the others. *Id.* at 648. Those concerns are not present here, because—as the Trustee agrees—neither Caldor and Bradlees, nor their respective committees, hold claims against each other, and they are otherwise unrelated, but for the fact that the retailers compete in the same market niche. In *In re Calabrese,* 173 B.R. 61 (Bankr.D.Conn.1994), the court denied the creditors committee's application to retain counsel where proposed counsel also represented three of the debtor's largest secured creditors in matters not related to the bankruptcy case. In doing so the court found that it was not "material" that counsel would not represent the secured creditors in connection with the case so long as they continued to represent such creditors generally, because the concurrent representation would taint the firm's employment as committee counsel with the appearance of conflict. *Id.* at 63. The court was also concerned that counsel's ability to assist the committee in investigating the validity, priority and extent of the secured creditors' interests would be impaired. *Id.* As noted in *Daido,* however, the *Calabrese* court based its decision on its own view that the exception to a *per se* bar in the case of representation of creditors of the same class was inapplicable to representation of creditors in different classes. *See* 178 B.R. at 131. It did not consider whether the prohibition in the first sentence of § 1103(b) extends to representation of an entity other than the committee in a matter unrelated to the bankruptcy proceedings *Id.; see In re Calabrese,* 173 B.R. at 63. In any event, *Calabrese* is distinguishable because the Professionals do not concurrently represent an entity holding a secured claim against the estate. Neither Bradlees nor the Bradlees Committee is a creditor in this case, let alone a secured creditor.

■■■■ Courts look to the Code of Professional Responsibility in analyzing conflicts under the Bankruptcy Code. *See, e.g., In re GHR Energy Corp.,* 60 B.R. 52, 61 (Bankr. S.D.Tex.1985) (in interpreting the term "adverse interest" courts have "looked for guidance in the Code of Professional Responsibility"); *In re H & S Transportation Co.,* 53

B.R. 128, 131 n. 2 (Bankr.M.D.Tenn.1985) ("courts [have] turned to the disciplinary rules under Canon 5 of the Code of Professional Responsibility as an aid in identifying when an attorney is representing adverse interests"). Disqualification of counsel ordinarily is appropriate only when a violation of the Canons of the Code of Professional Responsibility poses a significant risk of real taint to a proceeding. *Armstrong v. McAlpin,* 625 F.2d 433, 444–46 (2d Cir.1980) (*en banc* ), *vacated on other grounds and remanded,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). "Thus, although doubts should be resolved in favor of disqualification, the party seeking disqualification must carry a 'heavy burden' and meet a 'high standard of proof' before a lawyer is disqualified." *In re Wingspread Corp.,* 152 B.R. 861, 863 (Bankr.S.D.N.Y.1993) (quoting *Bennett Silvershein Associates v. Furman,* 776 F.Supp. 800, 803 (S.D.N.Y.1991)).

■■■■ The Trustee contends that Otterbourg's retention is barred by Canons 4, 5 and 9 of the Code of Professional Responsibility. Disqualification is proper thereunder

(1) where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client, or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example, in violation of Canons 4 and 9, thus giving his client an unfair advantage.

*Board of Education v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979) (citations and footnotes omitted). On the stipulated record herein, the Trustee has not met its heavy burden of proving that Otterbourg's retention is barred under the Code of Professional Responsibility.

■■■■ Canon 4 of the Code of Professional Responsibility requires a lawyer to preserve the confidences and secrets of his client. For these purposes,

"[c]onfidence" refers to information protected by the attorney client privilege under applicable law, and "secret" refers to

other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.

Code of Professional Responsibility DR 4–101(A). The Trustee argues that Otterbourg is disqualified from representing the Caldor Committee under Canon 4 because concurrent representation of both Committees creates the possibility that Otterbourg may inadvertently disclose privileged information obtained in representing the Caldor Committee to the Bradlees Committee. Disqualification under DR 4–101 is rooted in concepts of fundamental fairness; "allowing an attorney who is in a position to use confidential information gained through a relationship with the client's adversary would give the client an unfair advantage." *Liu v. Real Estate Inv. Group, Inc.,* 771 F.Supp. 83, 87 (S.D.N.Y.1991). Accordingly, the party seeking disqualification must establish a substantial relationship between the issues in the litigation and the subject matter of the prior representation, or that counsel had access to confidential material substantially related to the litigation. *Prudential Securities, Inc. v. Wyser–Pratte,* 187 A.D.2d 306, 307, 589 N.Y.S.2d 335, 337 (N.Y.App.Div.1992). *See, e.g., Lammers v. Lammers,* 205 A.D.2d 432, 613 N.Y.S.2d 906 (N.Y.App.Div.1994) (holding wife entitled to disqualification of husband's counsel because counsel had obtained confidential information from wife in conservatorship proceeding which counsel later used against her in family court proceeding); *Schmidt v. Magnetic Head Corp.,* 101 A.D.2d 268, 476 N.Y.S.2d 151 (N.Y.App.Div.1984) (holding that court erred in failing to disqualify firm from representing non-corporate defendants in shareholder derivative action where firm had acted as general counsel to corporations). That nexus is missing in this case. The interests of the Committees are not adverse; there is no current or proposed litigation between the debtors or the Committees, and the Committees are not party to the same bankruptcy case. Neither Committee is likely to be in a position to take advantage of attorney-client confidences disclosed by the other to Otterbourg. The Code of Professional Responsibility places the burden of maintaining and policing client confidentiality upon the attorneys in a firm. *See* Code of Professional Responsibility DR 1–104 (supervisory lawyer responsible for the misconduct of lawyers or nonlawyer employees and associates) and DR 4–101(D) (requiring lawyers to exercise reasonable care in preventing employees, associates or others from disclosing confidences). None of the facts in the record suggest either that Otterbourg is unlikely or unable to fulfill those ethical responsibilities. As noted, Otterbourg has carried out its responsibility by voluntarily establishing an information barrier. Notably, the parties have stipulated that there is no evidence that Otterbourg's Caldor Team has disclosed confidential information obtained in the course of representing Caldor. We find that Otterbourg has not violated Canon 4 of the Code of Professional Responsibility.

■■■■ Canon 5 of the Code of Professional Responsibility mandates that an attorney exercise independent professional judgment on behalf of a client. Accordingly,

[e]xcept with the consent of the client after full disclosure, a lawyer shall not accept employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests.

Code of Professional Responsibility DR 5–101(A). DR 5–105 provides:

A. A lawyer shall decline proffered employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve the lawyer in representing differing interests, except to the extent permitted under DR 5–105(C).

B. A lawyer shall not continue multiple employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing differing interests, except to the extent permitted under DR 5–105(C).

180

C. In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that the lawyer can adequately represent the interest of each and if each consents to the representation after full disclosure on the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each.

D. While lawyers are associated in a law firm, none of them shall knowingly accept or continue employment when any one of them practicing alone would be prohibited from doing so under DR 5–101(A), DR 5–105(A), (B) or (C), DR 5–108 or DR 9–101(B).

Code of Professional Responsibility DR 5–105. For these purposes, the term "differ-

ing interests" means "every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client whether it be a conflicting, inconsistent, diverse or other interest." *See* Code of Professional Responsibility Preamble, Definitions. The Trustee contends that Otterbourg's concurrent representation of the Committees violates Canon 5 because the interests of the Committees are adverse and because Otterbourg's ability to vigorously represent each committee may be influenced by the dual representation. As support, the Trustee cites *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir.1976) and *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225 (2d Cir.1977). However, in those cases, attorneys were disqualified for directly[3] or indirectly[4] representing clients with adverse in-

**3.** In *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, an attorney ("Fleischmann") was a partner in two law partnerships, located in Buffalo, New York (the "Buffalo Firm") New York, New York (the "New York Firm"), respectively. The Buffalo Firm was retained to represent Cinerama and several other defendants in two actions alleging, respectively, antitrust violations resulting from discriminatory and monopolistic licensing and distribution of motion pictures and illegal distribution of motion pictures (the "Buffalo Litigation"). *Id.* at 1385. The New York Firm was retained by Cinema 5 to bring an action against Cinerama and others to recover damages occasioned by an alleged conspiracy to acquire control of Cinema 5 through stock acquisitions, with the purpose of creating a monopoly and restraining competition (the "New York Litigation"). *Id.* The district court granted Cinerama's motion to disqualify plaintiff's counsel. *Id.* On appeal, the Second Circuit affirmed reasoning that when Cinerama retained Fleischmann's Buffalo Firm as counsel in the Buffalo Litigation it was entitled to Fleischmann's undivided loyalty until the end of the case and could expect that he would not accept a retainer for any purpose that might be adverse to its interests. *Id.* at 1386. Likewise, when Cinema 5 retained Fleischmann's New York Firm in the New York litigation, it was entitled to the undivided loyalty of all members of the firm until the end of the case. *Id.* The court concluded that as a partner in each firm, Fleischmann could not fulfill his duty of undivided loyalty to both Cinerama and Cinema 5 and because attorneys must avoid even the appearance of conflict, the dual representation of patently adverse interests required the disqualification of Fleischmann and the New York Firm. *Id.* at 1387.

**4.** In *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, Morgan Lewis & Bockius ("MLB") was retained as U.S. counsel by the Canadian liquidator for Fund of Funds, Ltd. ("FOF"), an investment entity which had gone into liquidation after suffering losses allegedly arising out of fraudulent securities transactions. *Id.* at 228. At that time, MLB was already representing Arthur Andersen & Co. ("Andersen") as regional counsel on unrelated matters. Certain members of MLB knew that Andersen, which had been FOF's accountant and had certified the allegedly fraudulent statements, could be a target of litigation in the FOF case. *Id.* at 229. Over the ensuing nine months MLB investigated the allegedly fraudulent transactions and delayed consideration of a suit against Andersen, although they sent any sensitive documents they discovered concerning Andersen to the Canadian liquidator. *Id.* While this investigation was ongoing, MLB created an information barrier between the attorneys representing Andersen and the attorneys representing FOF. *Id.* at 230. Ultimately, MLB, aware that it could not litigate against Andersen assisted the liquidator in selecting another firm ("MTJ") with whom MLB had a close working relationship to conduct the action against Andersen. *Id.* at 231–32. Andersen moved to disqualify MTJ from representing FOF alleging that MLB had breached its fiduciary duty of loyalty to Andersen and MTJ, as its litigation proxy, was merely an extension of that breach, and that MTJ had been privy to confidential information concerning Andersen that MLB had gained through prior representation. Andersen also moved to dismiss the complaint and suppress certain evidence. The district judge found that MLB had participated in the filing of a suit against Andersen did not find that MTJ had violated Canons 4, 5 and 9 of the Code of Professional Responsibility. It held that MTJ could continue to represent FOF because it was "highly unlikely" that confidential information had

terests in the same, or related, litigation. That is not the case here. The parties agree that the Committees are not parties to the same action and do not anticipate litigating against each other. The Committees' interests are not adverse and Otterbourg will not breach its fiduciary duty of loyalty to the Caldor Committee by simultaneously representing the Bradlees Committee. In assisting each Committee to fulfill its fiduciary duties, Otterbourg will perform a number of activities including investigating the validity and priority of liens, investigating the debtors acts, assets, liabilities and financial condition, investigating the operation of the debtor's business, and participating in the formulation of a plan. *See* 11 U.S.C. § 1103(c). The stipulated facts prove that none of these activities is likely to directly affect Bradlees or the Bradlees Committee. That the debtors are economic competitors in an allegedly consolidating marketplace is too speculative a basis for finding that Otterbourg's loyalty to each of its clients will be divided as a result of the representation. The Trustee did not cite, and we have not found, any support for the proposition that the representation of economic competitors violates Canon 5. ABA Comment to Rule 1.7 of the ABA Model Rules of Professional Conduct states, in relevant part, the "simultaneous representation in unrelated matters of clients whose interests are generally adverse, such as competing economic enterprises, does not require the consent of the respective clients." New York's Code of Professional Responsibility does not contain this phrase. Nonetheless, we find it instructive of how to analyze the issue of economic competitors under New York's Code of Professional Responsibility. That is the view of Prof. Ray Simon of the Hofstra University School of Law, a published authority on New York's Code of Professional Responsibility. *See* Simon Report dated December 7, 1995. Further, the Caldor Committee has consented to Otterbourg's representation of the Bradlees Committee and the Bradlees Committee has not objected to Otterbourg's retention in this case. Otterbourg's disqualification is not warranted under Canon 5.

Canon 9 of the Code of Professional Responsibility provides that the attorney should avoid even the appearance of impropriety. Courts are reluctant to rest a disqualification exclusively upon Canon 9 and generally require proof that another Canon has been violated. *Hartford Accident and Indem. Co. v. RJR Nabisco, Inc.,* 721 F.Supp. 534, 538 (S.D.N.Y.1989). *See Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 757 (2d Cir.1975). *See also Board of Education v. Nyquist,* 590 F.2d at 1247 ("[W]hen there is no claim that the trial will be tainted, appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases."). Where the firm concurrently represents both parties to a case, the proposed representation is *per se* improper unless the clients consent or the attorney demonstrates that there will be no actual or apparent conflict in loyalties or diminution in the vigor of the attorney's representation. *See Glueck v. Jonathan Logan, Inc.,* 653 F.2d 746, 749 (2d Cir.1981); *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d at 1387. The Trustee contends that dual representation of the Committees would create an appearance of impropriety because the Committees' in-

---

been disclosed and recommend that MTJ withdraw in view of the appearance of impropriety, which it did. On appeal, the Second Circuit held that MTJ should have been disqualified. It found that MLB's participation in the investigation of Andersen, the selection of MTJ to bring the litigation, and preparation of the MTJ complaint was a breach of the duty of undivided loyalty set forth in Canon 5. *Id.* at 234. The court viewed the delegation of the Andersen action to MTJ as an improper attempt by MLB to delegate its fiduciary duty of loyalty to Andersen to a third party. *Id.* The Second Circuit held that MTJ was disqualified under Canon 5 and 9 because it aided and abetted MLB's breach of its fiduciary duty

and was thus an extension of MLB's continuing involvement in the underlying action. Knowing that MLB was ethically foreclosed from bringing the case itself, MTJ should not have accepted the retainer. *Id.* The appearance of impropriety was furthered by the fact that the close working relationship between MTJ and MLB arose when the firms collaborated in filing a related case on behalf of the liquidator and served as co-counsel in an unrelated securities case brought on behalf of the liquidator. The Second Circuit also found reason to disqualify MTJ in Canon 4 because MTJ had had significant and repeated contact with MLB in preparing the case.

terests are adverse, as demonstrated by Otterbourg attempt to divide its bankruptcy department into two firms by use of an information barrier. However, the interests of the Committees are not adverse. The bankruptcy matters are completely separate. For example, the Committees do not oppose each other on any particular matter and do not seek compensation from the same fund of money. Although the debtors are economic competitors, the Committees themselves are not competitors in any forum. In addition, the segregation of Otterbourg's Caldor Team from its Bradlees Team through use of an information barrier augments, rather than undermines the propriety of the dual representation. The Committees are not adverse, and at best, the appearance of impropriety arising from the Professionals' simultaneous representation of them is "not particularly clear". *See Board of Education v. Nyquist*, 590 F.2d at 1247. Canon 9 provides no support for the Trustee's objection.

### Conclusion

Based on the foregoing, the Trustee's objection to the retention of the Professionals is overruled.

SETTLE ORDER.